[Crim. No. 1138.   Third Appellate District.—February 7, 1931.]

THE PEOPLE, Respondent, v. CHARLES WILEY, Appellant.

Hugo McKinley and L. B. Svhlingneyde for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

MR. JUSTICE THOMPSON (R. L.) DELIVERED THE OPINION OF THE COURT.—The defendant was convicted of the crime of murder of the first degree and was sentenced to imprisonment for life. He became intoxicated and went on a rampage. He shot and killed three men. His excuse for the killing was that these men had beaten him the night before the fatal shooting until he became insensible and then robbed him of his money. His defense to the charge of murder was that the beating which he received caused temporary insanity and that he therefore failed to appreciate the nature of the act which resulted in the killing.

At the trial the defendant denied his guilt and separately pleaded insanity. The jury found him guilty as charged and imposed the penalty of life imprisonment. The same jury subsequently found that he was sane at the time of the shooting. At the trial of the issue with respect to his sanity the verdict was signed by a member of the jury, as foreman, other than the one who signed the previous verdict which found him guilty of murder. The jury was polled at both trials and the members were unanimous in the rendition of their verdicts.

The appellant's attack is directed only to an asserted invalidity of the verdict as to his sanity. It is claimed this verdict is void because, (1) it was not signed by the same foreman who signed the verdict finding him guilty of the charge of murder, (2) the burden of proving his insanity was placed on the defendant without first requiring the prosecution to prove a *prima facie* case of guilt, (3) the court failed to appoint alienists as required by section 1027 of the Penal Code, (4) the argument of defendant's counsel was unduly restricted, and, (5) the district attorney was guilty of prejudicial misconduct.

The fact that the verdict as to the defendant's sanity was not signed by the same member of the jury, as foreman, who signed the first verdict establishing his guilt of the crime of murder, does not invalidate it. The signing of a verdict by a foreman is a mere means of authenticating the finding of the jury. There is no provision of the statutes requiring that the foreman of a jury, which is impan-

eled to try the issue of insanity, shall be the same foreman who is selected to try the chief issue as to the guilt of the accused. Section 1026 of the Penal Code provides that in the event of a plea of insanity, that issue may be tried "either before the same jury (which tried the question of the guilt of the defendant as to the crime charged) or before a new jury, in the discretion of the court". Indeed, the law does not even require a verdict to be signed by a foreman. In the absence of such statute we assume a verdict may be authenticated by any member of the jury. The form of a verdict is prescribed by statute and it does not require the signature of any member of the jury. The authenticity of the verdict is ascertained by requiring it to be orally declared in open court by the foreman. If demanded by either party, the verdict must be declared by each member of the jury as provided by section 1149 of the Penal Code. This is what is commonly termed polling the jury. In 16 C. J. 1100, section 2582, it is said: "In the absence of statute requiring it, a written verdict need not be signed by the foreman of the jury, or by any of the jurors, although it is the usual and better practice for one of the jury, particularly the foreman, to sign it."

There was no error in requiring the defendant to assume the burden of proving his insanity at the time of the shooting without further evidence of the crime on the part of the prosecution. The case was tried by the same jury on both the issue as to the commission of the offense by the defendant and as to the plea of insanity. The evidence of the guilt of the defendant was already before the jury. It was said in *Ex parte Merwin*, 108 Cal. App. 31 [290 Pac. 1076]: "The cause presented by the information and the defendant's pleas thereto was a single cause and the trial thereof a single trial."

The defendant was not prejudiced by the failure of the court to appoint two medical experts pursuant to section 1027 of the Penal Code to examine the defendant with respect to his sanity. This right to such an examination on the part of the defendant was waived. The last-mentioned section provides in part: "When a defendant pleads not guilty by reason of insanity the court must select and appoint two alienists, at least one of whom must be from the

medical staffs of the state hospitals . . . to examine the defendant and investigate his sanity. . . . ''

This selection and appointment of alienists by the court was not made. That requirement on the part of the court, *when it is requested,* is mandatory. It is a humane provision and was enacted in the interest of fairness *for the* benefit of an impecunious defendant whose sanity, at the time of the commission of an alleged offense, is an issue at the trial. An examination of the accused by such impartial medical experts who are selected by neither of the partisans to the action, but by the court, is most likely to be free from bias. Upon request the defendant is entitled to the fulfillment of this requirement of the statute. It would constitute error to refuse such request.

The examination of an accused by alienists which are appointed by the court is, however, not a jurisdictional proceeding and may be waived. In the present case it was waived. There was no request of the court, on the part of the defendant, to appoint such alienists and no objections to the proceedings in this regard. Six alienists were examined as witnesses at the trial regarding the sanity of the defendant. Four were summoned by the defendant and two were called by the prosecution. Both of the expert witnesses who testified for the prosecution were members of the medical staff of the Stockton State Hospital. One of these alienists was Doctor M. H. Smyth who had served on that staff for thirty years, and, at the time of the trial was acting as superintendent of that institution. Under such circumstances, in the absence of a request for the appointment of alienists, and in the absence of objection to the evidence of those who did testify on the part of the defendant, he was not prejudiced by the failure of the court to appoint the alienists as provided by the statute.

During the closing argument of defendant's attorney he attempted to inform the jury that in the event "the defendant is found not guilty by reason of insanity", the accused would not necessarily be discharged from custody, but upon the contrary, under the provisions of section 1026 of the Penal Code, the court would then "direct that the defendant be confined in the state hospital for the criminal insane", unless "it shall appear to the court [from the evidence at the trial] that the defendant has fully recovered

his sanity [since the commission of the offense]''. This is a correct statement of the law. This explanation of the law was evidently intended to alleviate the fears of jurors that their verdict of ''not guilty by reason of insanity'' might result in endangering society by discharging a maniac from the custody of the officers. This argument was interrupted and objected to by the district attorney who then erroneously stated, in the course of a colloquy with the court, that in the event of a verdict of ''not guilty by reason of insanity'' the defendant would thereupon necessarily become ''a free man''. The court also erroneously conceded this to be true. It is now asserted by the defendant that this curtailment of his argument was prejudicial error and resulted in a miscarriage of justice. We think not.

The attempt on the part of defendant's counsel to discuss the procedure which might follow as a result of their verdict amounted to an invasion of the province of the court and was clearly improper. The jury was not concerned with the question of the defendant's state of mind at the time of the trial, except so far as his mental condition at that time might furnish evidence of his sanity or insanity at the time of the commission of the crime with which he was charged. The jury was subsequently correctly instructed by the court that ''you are to determine . . . whether the defendant was sane or insane on April 28th, 1930, at the time he killed Joe Bartley, Deloice Fultz and Jack Murphy''. The jury was further instructed: ''Evidence of the defendant's sanity or insanity before and after the date of the killing is admissible in evidence for the purpose of proving the sanity or insanity of the defendant on April 28th, 1930, and for no other purpose.''

It was not contended the defendant was insane at the time of the trial. The evidence of his insanity during any period of time was very slight and unsatisfactory. As a boy, in common with others, he was taught with difficulty and held an antipathy for schools. When he grew to manhood he became a mere laborer, but avoided working whenever it was possible. He became dissipated and associated with tramps. He was evidently a common itinerant. In 1915 he was committed to a state hospital for inebriacy. The night before the shooting he was intoxicated and engaged in a drunken quarrel with his itinerant companions at

their camp near Crows Landing. A fight ensued between them that night. As a victim of their beating the defendant claims to have been left unconscious at a culvert near by. The circumstances of the shooting indicate a deliberate and atrocious plan to kill his companions for no better reason than that they had beaten him severely and perchance robbed him of a small sum of money. After the killing he started up the river along a trail carrying the rifle with which he had accomplished the homicide. Meeting Mr. Hutchinson, with whom he was acquainted, he said: "I have three of them laid out down there . . . (you) telephone to the sheriff." Hutchinson testified the defendant's face was bruised from the beating he had received. In response to the question, "Did he appear to be perfectly cool and collected and rational and at himself?" he replied, "Yes sir." Mr. Nunes, who owned a dairy ranch in that vicinity was walking along the pathway on the levee to feed some stock which were kept in a corral, when he heard the three shots which were fired by the defendant. Soon afterward the defendant came along the pathway and in response to an inquiry from Nunes as to the occasion for the shooting, he said: "They beat me up." Nunes testified: "They left him unconscious, he said, 'And when I waked up I get a gun and shot them and killed them, and I want you to go and telephone for the sheriff.' " There is evidence that the defendant said he regained consciousness and got up from the place where he lay near the culvert; that he went to the cabin and procured the rifle and approaching the door of the other cabin where two of his associates were sleeping he confronted one of them and raising his rifle said: "You took my money and I'm going to kill you." Thereupon he shot and killed him. He immediately fired upon the other occupant of the cabin with fatal result. Going to the cabin where the third victim slept he shot and killed him.

Dr. De Lappe, who examined the defendant at the jail, soon after his arrest on the day of the shooting, testified that the accused had both eyes blackened and had "rather a large contusion on the back of his head". Substantially all that the defendant's first expert medical witness testified to, which might tend to support the plea of insanity, was that such a contused wound as the defendant had might result from a blow severe enough to cause unconsciousness

for a period of eight or ten hours; that such a blow might cause concussion of the brain without actually fracturing the skull. Other alienists then testified that such concussion of the brain might result in temporary insanity, or acute mania, during which period the patient might not comprehend the nature of an act which he performed. The inference from their testimony is that a person so afflicted might even shoot and kill another without realizing what he was doing, or that it was wrong to do so. This evidence is entirely hypothetical. ■ The record amply supports the verdict of the jury to the effect that the defendant sustained no such concussion of the brain as a result of the beating which he received and that he was perfectly sane at the time of the shooting.

■ Finally and most insistently the defendant asserts that the district attorney was guilty of prejudicial misconduct in arguing to the jury as follows: ''He [the defendant] must be held responsible for his conduct. Why did he go over there to Hutchinson's, first? Why did he go to Nunes and say, 'I have killed three men?' Nunes said he appeared then to be perfectly normal, cool and collected, not excited. He knew what he had done. You will observe that . . . when I attempted to cross-examine this defendant in respect to what occurred after he became unconscious, I was blocked. . . . He knows better than any man . . . whether he knew right from wrong, he knows what he was doing. . . . Nowhere do you hear a voice in this courtroom (asserting) that this defendant on the day that he killed those three men, didn't know what he was doing.'' This argument was assigned as prejudicial error and the court was asked to instruct the jury to disregard it. The court refused to so instruct the jury. We are of the opinion this was neither improper argument nor prejudicial. When the defendant became a witness in his own behalf on the trial involving his sanity at the time of the commission of the offense with which he was charged, he related the circumstances of his association and conflict with the three men whom he afterward killed. His story ended with the statement, ''Jack and Murphy grabbed me and throwed me down and Slim commenced beating me in the face. He says, 'Take his money off of him . . . and throw him into the river.' . . . Jack, he was getting my money out, . . . and I got it (the

purse) in my hand. . . . He (Slim) told Murphy to help him, and finally wrenched it out of my hand, and that was the last I remember." On cross-examination the district attorney asked the defendant: "Q. Where were you when you said you became unconscious . . . ? When you awakened the next morning, you were near the culvert, were you not?" To this question the court sustained an objection on the ground that it was not proper cross-examination. The examination as to the conduct of the defendant was not pursued further.

In assigning the foregoing argument of the district attorney as prejudicial, the defendant in his brief says, "Defendant testified in chief as to certain drinking indulged in, and as to beatings administered to him on April twenty-seventh. It was the contention of the defense that as a result of these beatings, the defendant was rendered unconscious, and remained that way for a period of from eight to ten hours. The following morning he committed the homicide before regaining full consciousness, and while suffering from traumatic psychosis."

It was therefore competent to cross-examine the defendant upon his conduct or recollection as to his acts on the morning of the shooting. His testimony left the inference that because of the beating which he had received, he did not know what he was doing and was irresponsible for his conduct. Clearly, the question, "When you awakened the next morning, you were near the culvert, were you not?" was competent. The court erroneously sustained the defendant's objection to this question. Because of the defendant's improper objection, the prosecution was precluded from proceeding to ascertain from the witness the extent to which he claimed to be ignorant of his acts and conduct on the morning of the shooting and the duration of the time this pretended lapse of memory lasted. It would have been proper cross-examination for the district attorney to have asked the defendant to relate just what he did recall after he claimed to have become unconscious; to have asked him why he returned to the cabin; whether he recalled a purpose to punish his assailants for stealing his money; how he knew where to find the rifle with which he killed his victims and all the circumstances which might tend to show whether he was conscious or unconscious, sane or insane at the time

of the shooting. In the absence of this testimony on the part of the defendant, the prosecution had a perfect right to argue from his theory of the record, as it stood, that the defendant was conscious of his acts; that he fully comprehended the nature of the transaction and knew it was wrong to shoot his companions. Indeed the defendant told Hutchinson immediately after the shooting, "It's too bad, too bad I done it, I am a good American citizen, too bad I done it." This indicates knowledge of the evil of the homicide.

There was no prejudicial error in the district attorney declaring, in the course of his argument, that he was "blocked" in his effort to show by the defendant on cross-examination that he comprehended and knew exactly what he was doing on the morning of the killing. There was no error in his saying, as his conclusion from the record as it stood, that the defendant did know "better than any man . . . whether he knew right from wrong", or the nature of the acts which he performed at the time of the killing. Nor was it error for him to say he had heard no voice in the courtroom asserting that the defendant did not know what he was doing at the time of the shooting. To be sure the defendant's attorney was undoubtedly claiming his client did not know what he was doing when he fired the fatal shots. This was the entire theory of his defense. But clearly the district attorney was referring to the fact that no witness, expert or nonexpert had specifically said the defendant did not then know what he was doing. There is no error in commenting upon the fact that a defendant who became a witness in his own behalf regarding his own sanity failed to testify as to whether he did or did not comprehend the nature of his acts at the time of the commission of the offense with which he is charged. The fact that an erroneous ruling of the court aided the defendant in avoiding these statements, made them none the less competent. It would be a preposterous rule that would permit an accused, who relied upon the defense of insanity, to testify to the conduct of others which he claims caused the mania and then close the door to an inquiry from him as to whether in fact it did not result in rendering him irresponsible for the acts which he performed. In the examination of one upon the issue of insanity, a wide latitude is allowed.

The challenged argument was not improper. There is no miscarriage of justice in this case.

The judgment and the order are affirmed.