[Crim. No. 8526. Second Dist., Div. Two. Apr. 22, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. WILL JONES, Defendant and Appellant.

Morris Lavine for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and N. Gregory Taylor, Deputy Attorney General, for Plaintiff and Respondent.

ASHBURN, J.—Convicted of second degree murder after a nonjury trial defendant appeals from the judgment. His counsel raises two points—insufficiency of the evidence "to sustain the verdict and judgment" and a claim that the crime, if any, was manslaughter and this court should reduce the offense accordingly.

█ In support of his first point counsel makes no attempt to comply with the cardinal rule of appellate practice that all of the evidence, both favorable and unfavorable, must be presented in appellant's brief so that the court may determine whether there is any substantial evidence to support the finding of guilt (see *Davis* v. *Lucas,* 180 Cal.App.2d 407, 409-410 [4 Cal.Rptr. 479]). The rule extends to criminal as well as civil cases (*People* v. *Justice,* 167 Cal.App.2d 616, 618-619 [334 P.2d 1031]). █ The reason for counsel's casual treatment of the record is not far to seek, for the court of review must accept as true the substantial evidence favorable to respondent (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]).

As defendant's own version of the facts stands practically alone[1] and opposed to that of the prosecution witnesses, this court, disregarding conflicts and assuming the truth of the prosecution's proofs, finds the factual situation to be as follows.

Defendant, Will Jones, and a casual friend, Fred Douglas Hawkins, were playing the card game of cooncan in defendant's shoe shining shop on March 24, 1962, at about 6 to 7 p.m., each having bet three dollars on the game; a dispute arose as to who had won; they began to swear at each other, then arose and started fighting. Appellant apparently had not been drinking. As he made a motion to strike Hawkins, the latter got in the first blow, hitting defendant in the mouth; he staggered back and both men pulled knives; defendant also grabbed the footrest of the shoe shine apparatus; Hawkins grabbed a full bottle of Miller High Life beer. As they were maneuvering, one Thomas grabbed defendant and one Fields grabbed Hawkins and held him. Thomas and Fields were trying to pacify the fighters, who were swearing at each other.

---

[1]Defendant had been convicted of robbery in 1950.

Finally defendant said he would give up his knife and foot-rest if Hawkins would give up his knife and bottle of beer. This they did. Then defendant ordered Hawkins out of the place and immediately turned toward the rear of the room, walking without incident between Hawkins and Fields. Hawkins, Fields and Thomas then left. Before they did so defendant had said, "I am going to get a man for hitting me in my mouth. I am going to get you for hitting me." Defendant himself testified that after they left "there was nobody in the shine stand but a guy sitting in the window comes in there sometimes. I put my foot on the shine stand, the first step on the shine stand to block his view and I looked under this cushion that I stated I sat on and I got this gun that this officer had here and put it in my pocket." Also that he loaded the gun on the sidewalk. Hawkins and Fields walked toward the lamppost on the corner (some 35 feet from the door of the shine shop); Hawkins put his knife (which had been restored to him by Fields) in his pocket. Fields looked around and saw defendant Jones running toward them with his fist doubled and obviously intending to hit Hawkins who, warned by Fields, turned quickly and struck defendant in the face with his fist. Defendant staggered back and hit his right pocket with his hand. Hawkins said, "that is all right, man. I know you got your pistol. I know you going to shoot me." He was leaning against the lamppost with one hand extended outward. Defendant snapped the pistol out of his pocket and said, "you damn right. I am going to kill you." He then shot Hawkins, who grabbed for his stomach and fell to the ground. Jones was about 7 to 8 feet away when he fired the gun. Hawkins had made no move for his pocket before he was shot. Jones turned and walked back to his shine shop where he stood talking for a few minutes. Then he ran back to Hawkins, who was lying on the ground wounded, and said: "You dirty son-of-a-bitch, I kick you back of the head." He kicked his victim once back of the head, smacked his face, kicked him in the stomach and hit him in the stomach with the gun. Fields called some passing police who took Jones into custody. As he rode by in the police car he leaned out of the window and said: "Is the [obscene name] dead yet?"

Robert Dollarhide, a school administrator who was driving by, saw the shooting after one man had started away from the other, then had turned with his hand in his pocket and had shot the first man. He also saw the smaller man (Jones) over the larger one (Hawkins), kicking him more than once

above the torso. The car Dollarhide was in drove around the block and as it passed again he saw the assailant kick the man on the ground several times.

Officer Spiess, who had defendant in the police car, said he called to a friend, "get me a lawyer." The officer found his gun in the shoe shine stand "under the curb and on the shine seat, the bench or chair that he used to sit on." Defendant told Spiess he had kicked Hawkins a few times and also said, "I don't care whether he dies or not. I hope he does." To Officer Sullivan defendant said, on that same evening at about 7:30 p.m., " 'he fell down on the sidewalk and when he fell I started kicking him. After I had shot him he was through. I kicked him because I didn't care whether he died or not.' " To Officer Butts at about 9 p.m., " 'I don't know why I started kicking him.' "

Defendant's own explanation of the shooting was: "What was the reason for shooting him? I shot him because he just hit me in the mouth and busted all my mouth open. He done hit me in the place and—just human instinct of a human being trying to protect himself. Q. Were you trying to protect yourself? A. Sure." Further, in pursuit of his claim of self-defense, he said: "Q. When you pulled your knife out and got this shoe rest and Hawkins had the knife out, were you mad at Hawkins at that time? . . . The Witness: I could say I was a little angry after I had been hit. I would say that. Q. By Mr. Marin: And you were afraid, also, that Hawkins might use this knife on you? A. Well, yes and no. As long as I had as much as he had, maybe not. It is possible." Concerning fear of Hawkins: "Q. You testified you walked right by Mr. Hawkins and went back to the restroom. A. Yes. I passed him. Q. Weren't you afraid that he might stab you at that time? . . . Q. You weren't afraid of it even though he had a knife; is that right? The Court: He wasn't that close enough to you? The Witness: That is what I mean. The Court: Even though he had a knife—The Witness: Because I run too well." Also: "Q. By Mr. Marin: Were you afraid of him when you went by him there? A. I was afraid of him in a sense, yes."

█ " 'Self-defense may be resorted to in order to repel force, but not to inflict vengeance. . . .' " (*People* v. *Holt*, 25 Cal.2d 59, 66 [153 P.2d 21].)

█ The trial judge remarked at the close of the case: "The Court agrees with Mr. Marin that there would be sufficient evidence here for a jury, in the Court's opinion, to find first

degree.'' We quite agree with this. '' 'There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind. ▮ It is only necessary that the act of killing be preceded by a concurrence of will, deliberation, and premeditation on the part of the slayer, and if such is the case, the killing is murder in the first degree, no matter how rapidly these thoughts of the mind may succeed each other, or how quickly they may be followed by the act of killing.' (*People* v. *Hunt,* 59 Cal. 430, 435, and *People* v. *Machuca* [158 Cal. 62 (109 P. 886)] and *People* v. *Bellon* [180 Cal. 706 (182 P. 420)], *supra.*)'' (*People* v. *Dale,* 7 Cal.2d 156, 160 [59 P.2d 1014].) There was ample evidence to sustain a finding of premeditation had the court made one.

▮ The only difference between first and second degree murder (except in felony homicide cases) is the presence or absence of premeditation. Fricke on California Criminal Law (7th ed.) page 146: ''Murder of the second degree is distinguishable from murder in the first degree in that, while the element of malice aforethought is present in both degrees of murder, in murder of the second degree the killing is not wilful, deliberate and premeditated. All unlawful killings with malice aforethought are murder and if a particular murder does not measure up to the requirements of murder of the first degree it must be murder of the second degree.'' *People* v. *Thomas,* 25 Cal.2d 880, 895 [156 P.2d 7]: ▮ ''In order to establish murder of the first degree the burden is upon the prosecution to produce evidence which satisfies the minds of the jurors beyond all reasonable doubt not only that an unlawful homicide with malice aforethought was committed by the defendant but also that such homicide was of a type specifically enumerated in the statute as being murder of the first degree or was of equal cruelty and aggravation with those enumerated and was accompanied with a deliberate and premeditated intent to take life. ▮ 'When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree.' ''

▮ To reduce a crime from second degree murder to manslaughter it is necessary that the evidence be without substantial showing of the presence of malice. Fricke on Cali-

fornia Criminal Law (7th ed.) *supra,* page 152: "The distinction betweeen murder and manslaughter is that in murder the killing must have been with malice aforethought while in manslaughter the malice, express or implied, which is the very essence of murder is absent."

Penal Code section 188, provides: *"Malice Defined.* Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." The evidence at bar would justify a finding that there was express malice in defendant's mind when he shot Hawkins; also that there was no "considerable provocation" and were circumstances showing "an abandoned and malignant heart."

 "Even though a deliberate intention to kill is absent, if 'no considerable provocation appears' or 'the circumstances attending the killing show an abandoned and malignant heart,' malice will be implied. *(People* v. *Valentine,* 28 Cal.2d 121, 131 [169 P.2d 1]; *People* v. *Mears,* 142 Cal.App.2d 198, 204 [298 P.2d 40].)" *(People* v. *Bufarale,* 193 Cal.App.2d 551, 561 [14 Cal.Rptr. 381].)

 "Mere unrestrained and unprovoked rage, or a 'heat of passion' to wreak vengeance, of a legally sane although emotionally unstable or nervous person is no defense to homicide. . . . 'But as to the nature of the passion itself, our law leaves that to the jury, under these proper admonitions from the court. For the fundamental of the inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and *never, of course, the passion for revenge*—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' *(People* v. *Valentine* (1946) 28 Cal.2d 121, 139 [169 P.2d P. 1121].)" *(People* v. *Danielly,* 33 Cal.2d 362, 377 [202 P.2d 18].) (Italics added.)

 The trial judge remarked: "The court is satisfied that it was in the heat of passion that the actual shooting occurred, that he was certainly angry with the deceased, and the Court is satisfied that he acted through malice. . . ." But clearly the court did not mean that heat of passion that reduces the offense to manslaughter, for he specifically found malice on defendant's part. The record amply supports a

conclusion that the spirit of revenge was the passion which drove appellant on—that passion coupled with an obviously abandoned and malignant heart. This was a question of fact for the trial court and the record before us does not justify our upsetting his decision or our reducing the crime from second degree murder to manslaughter.

Judgment affirmed.

Fox, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied May 10, 1963, and appellant's petition for a hearing by the Supreme Court was denied June 19, 1963.