[Crim. No. 1724.   Fourth Dist.   Sept. 17, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. BILLY RAY LAWHON, Defendant and Appellant.

Leonard H. McBride, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

GRIFFIN, P. J.—Defendant-appellant was charged with murdering his child, Cheryl Lawhon, in violation of Penal Code, section 187. He pleaded not guilty and not guilty by reason of insanity. Alienists were appointed and a hearing in reference to his present sanity was conducted. A trial was had on the not-guilty plea, resulting in a verdict of guilty of murder in the first degree. The same jury determined that defendant was sane at the time of the commission of the offense. Upon stipulation waiving a jury trial as to the penalty, the court sentenced defendant to life imprisonment. He appealed from the judgment and order denying a new trial. No appeal lies from such order entered February 6, 1962, and it should therefore be dismissed.

There is no substantial controversy with regard to the facts. The defendant killed his baby daughter Cheryl by hitting her in the stomach with his fists with such force as to dislodge the root of the intestines and perforate the bowel, causing her subsequent death by generalized peritonitis. The

child was 8 months old at the time and defendant was 23 years of age.

The medical history of the dead baby showed that she had suffered a blow on the head in January 1961, but was not taken to a hospital until February 9, and that she was then found to be so severely injured that she suffered a subdural hemorrhage and her skull had to be tapped daily for seven to ten days. She was in the hospital continuously from February 21 to March 17. This injury caused the child to suffer convulsions. The police officer claims that defendant, in a signed statement, admitted that on January 20, 1961, while Cheryl was lying in bed, he started getting "sweaty and funny like a crazy man" and crept to her bed and slapped her on the back of the head twice, but did not remember hitting her any other place on her body, and that he took her to sick bay one hour later. Thereafter, on August 25, 1961, the baby was taken to the doctor in the afternoon and she was found to have a bruise on her left cheek but she appeared otherwise normal. Later that same day, she was brought to the attention of the same doctor, and he found that she had been struck in the abdomen and suffered the injury from which she died. Later, defendant signed a witnessed statement that on August 10 he was sitting in the living room and his wife was in the kitchen; that Cheryl was climbing around in her bed; that he walked over and told her to shut up and he slapped her on the leg; that about a week later he started getting "real nervous and sweaty" thinking about his little girl Cheryl; that a few days later he got the same feeling and thought about killing himself by driving into a tree but stopped himself by thinking of his wife and little girl; that on August 14 he was sitting on the couch watching television; that Cheryl was in her jumper, and that he had the same feelings he had had before; that he jumped up, shook her and put her to bed and about 15 minutes later sneaked up on her and slapped her face; that he was soaking wet with sweat and breathing hard and thought about killing himself before he killed her; that he was later again sitting on the couch reading and he started to play with Cheryl again and began to have the same feelings as before, and that before he knew it he had hit her in the stomach; that he didn't remember hitting her on the face and arms; that he took her to the bedroom and checked for anything he might have done and he noticed that she was crying and it appeared that she was trying to have a bowel movement; that

he knew that something was wrong because her stomach was very hard; that he rushed her to sick bay; that he felt that if something wasn't done for him he might kill her; that the statement was made by him without force or fear and of his own free will and no promises were made to him. It was signed "Billy R. Lawhon" and witnessed by two investigators. Defendant said that he could give no reason for his action, but stated that he knew what he was doing.

On the second trip to the hospital, the child was operated on and it was found that the blow must have been either due to the striking of the child in the abdomen by the fist, knee or the elbow, or any more or less round, solid, pointed object, and that it would require a great deal of force to lacerate the root of the mesentery and cause a rupture or perforation in the jejunum of the intestines; that due to the seriousness of the blow, gangrene of the intestines took place and it caused the demise of the baby on September 11, 1961.

The doctor's examination of the child on February 19, 1961, showed a collection of blood between the skull and the brain. The child improved and was later sent home. She was readmitted on March 17, 1961, because the mother called and said that Cheryl was having convulsive episodes. It proved to be posttraumatic epilepsy due to the previous assault. No note is made as to the cause of the condition. The parents did not reveal this cause, but the chart indicated that the child, four weeks prior to the February 19 admission, had fallen off the couch onto a cement floor. The child was discharged as a patient on March 22, and on March 24 she was readmitted and on March 30 a blood clot was removed from the right side of her head. She was discharged on May 17, 1961, and readmitted on August 25, 1961, after the blow was administered which caused her death.

In a conversation with defendant thereafter, defendant told an officer that the child had been injured in their home by a fall from the couch and that he had fallen onto the baby. Later, he changed his story and, in a written statement signed by him and received in evidence, he stated in general:

"20 January 1961 . . . While setting on a couch . . . I had a baby bottle on the stove heating . . . I was holding . . . my daughter Cheryl on my lap. I heard the bottle overheating and without thinking I jumped up to get the bottle and . . . Cheryl fell to the floor striking her head . . . . On August 14th I was sitting on the couch and was watching TV. Cheryl was sitting . . . in her jumper and I was watching . . . looking at her toy . . . . All of a sudden I looked at her and jump up and

grab her in her stroller and shook her, and then put her to bed, about a half hour later I would sneak up on her and slap her while she's asleep. I would break out in a cold sweat and get real . . . wet and breathing hard. I would then start crying and think about killing myself before I killed her, then on August 25th, 1961, I was again sitting on the couch reading and, then I started playing with Cheryl . . . I doubled up my right hand into a fist and hit her with all my might in the stomach (and also possible slap her over the face and body) . . . I rush her to the bed and start checking her for injuries. I noticed she was grasping [sic] for breath and she was trying to poo [bowel movement] and her stomach was getting hard like stone, I then took her to sick bay. . . . I feel that if I keep on as I have in the past, hitting and beating her I might kill her. . . . The above statement were [sic] made by me without force or fear and of my own free will and no promise were [sic] made to me. Billy R. Lawhon.''

Later, and after this statement was signed by defendant, he was taken to a room for tape-recording of his voice and he was questioned about his remarks in the signed statement. A tape recording was run in the presence of the jury and reduced to writing. He repeated his description of his actions on January 20, 1961, and added that he guessed the child struck her head on the floor when he jumped up to see about the heating bottle; that about August 14, 1961, she was sitting in her stroller and he just acted like a madman, grabbed her, shook her, then gave her a bottle and put her to bed, and later sneaked over and slapped her on the head and back; that he then hated himself and wished he would die; that on the last occasion she was sitting in her stroller and looked cute; that he picked her up, put her on the couch, and before he thought, he had hit her in the stomach with his fist with all his might, and then slapped and beat her around the body and head; that she seemed to gasp for air, her stomach started getting hard as a rock and he then took her to sick bay; that whenever this feeling came over him he felt he might well kill her. He then stated that all these statements were true and that no inducements were held out to him by the officers to persuade him to make them.

In an earlier conversation with another officer, defendant stated that he believed he dozed off while lying with Cheryl on the couch and she started to fall off it and he attempted to grab her and slipped and his knee went into her abdominal

area, but in a few minutes he changed his story and said that he hit her in the stomach with his fist, as described in his written and tape-recorded statement which he witnessed. He said that he was aware of the fact that he was hitting the child at the time, but that when he did he would get hot and cold chills and get sweaty all over.

The autopsy showed an old bilateral subdural hemorrhage and the brain showed a diffused scarring older than the age of the subdural hemorrhage and some older healing rib fractures.

Defendant testified that he had been married for three years, and that on the first occasion when his child was taken to the hospital, his wife was visiting neighbors; that he checked the comfort of the child in bed; that something happened as though the child had been struck and he couldn't tell whether he had done it or not; that he then noticed a bump coming on the back of her head and he placed cold towels on it; that his wife came home about that time and he couldn't tell her the truth and he said the baby fell off of the divan, and the child was taken to the hospital and remained there for some time; that the next time, in the absence of the child's mother, a weird feeling came over him and he slapped her and then walked outside and thought about taking his own life before he took hers; that on August 25, he sent his wife to the movies and he had this feeling again and he said something "come out of the air and struck her"; and that her stomach was getting hard and he rushed her to sick bay and told the doctor that he fell on the child and thought his leg had fallen on her stomach. He said he didn't know why he did it. He stated that after the child's injuries were inflicted he told his wife he should go to the hospital because his foot bothered him, but that he actually intended to go for psychiatric treatments but did not do so.

On the opening of the trial pertaining to the plea of not guilty by reason of insanity, the prosecution rested on the presumption of the sanity of the defendant. Defendant then produced a doctor versed in the practice of psychiatry. The doctor testified that at the hospital he read the medical findings of the examination and the reports of other psychiatrists appointed by the court and examined an electroencephalogram test and they showed tracings which were not those of a normal person. He concluded that defendant had an emotional disability. He stated that the defendant had told him that at age 8 he fell off a bicycle, suffered a skull fracture and was unconscious for about two days and in a hospital for one or two months;

that, basing his conclusion on this, and on one and one-half hours of observation of defendant in the jail, and of statements defendant made, if true, he believed defendant was unaware of what he was doing at the time. On cross-examination, the doctor was asked if most of us do not at certain times have emotional ills of some sort. He answered that some psychiatrists feel otherwise, but most feel that everybody has his troubles, including himself, and that there is no perfectly normal person, but that emotional illness may not constitute legal insanity; that there may have been unconscious forces that led to this, whether he was sane or insane, and if the unconscious forces were strong enough to create the situation that actually existed, he might not have been able to consciously be aware of the difference between right and wrong.

On cross-examination, the doctor admitted that "it's quite possible that a person can have these unconscious motivations and do a conscious act and know what they were doing and know it was wrong and still do the act"; that "psychoanalysis of a person or the determination of the subconscious motivation sometimes takes a considerable period of time . . . one to two years."

Defendant thereafter rested his case. The court instructed the jury in the language of California Jury Instructions Nos. 801, 803 and 806, and stated that the burden of proving insanity was on the defendant and that insanity, as the word is used in these instructions, means such a diseased and deranged condition of the mental faculties of a person as to render him incapable of knowing the nature and quality of his act or of distinguishing between right and wrong in relation to the act with which he is charged. The court also instructed in the language of Penal Code, section 189, that:

"All murder which is perpetrated by means of . . . torture, or any other kind of wilful, deliberate, and premeditated killing . . . is murder of the first degree; and all other kinds of murders are of the second degree."

█ The first question here presented therefore is whether the defendant established, as a matter of law, that he was insane. (*People* v. *Wiley,* 111 Cal.App. 622 [295 P. 1075].) The prosecution did not consider necessary the calling of the other court-appointed psychiatrists to testify on behalf of the prosecution, in view of the testimony of defendant's psychiatrist, since he (defendant's psychiatrist) examined the records and their reports indicating sanity and

did not definitely state that defendant was insane at the time. He said he could not say whether the defendant was a catatonic schizophrenic, and that he wouldn't know right from wrong. Defendant did not request the presence of these court-appointed psychiatrists. Since the jury was fully instructed on the subject, and the jury found that the defendant had not met the burden placed upon him, we see no error in this respect. (*People* v. *Richardson,* 192 Cal. App.2d 166 [13 Cal.Rptr. 321]; *People* v. *Butler,* 205 Cal. App.2d 437 [23 Cal.Rptr. 118]; *People* v. *Wiley, supra,* 111 Cal.App. 622, 626.)

The additional claim is that this court should reevaluate the M'Naughton right and wrong rule so as to afford defendant a fair trial on the issue of his sanity. This argument has been previously rejected and it has been uniformly held in this state that any change in the rule should come from the Legislature. (*People* v. *Rittger,* 54 Cal.2d 720 [7 Cal.Rptr. 901, 355 P.2d 645]; *People* v. *Darling,* 58 Cal.2d 15 [22 Cal.Rptr. 484, 372 P.2d 316]; *People* v. *Nash,* 52 Cal.2d 36 [338 P.2d 416]; *People* v. *Wolff,* *(Cal.App.) 30 Cal.Rptr. 285.)

The next question is the argument that there is not sufficient evidence to show that defendant committed murder in the first degree because there is lacking the required proof of murder by torture. (Citing *People* v. *Hooper,* 145 Cal. App.2d 180 [302 P.2d 94]; *People* v. *Tubby,* 34 Cal.2d 72, 81 [207 P.2d 51]; *People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7]; *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8].)

The rule in determining this question is set forth in *People* v. *Misquez,* 152 Cal.App.2d 471, 480 [313 P.2d 206], where it is said that it is murder by torture where the accused's intent is to inflict grievous pain and suffering on his victim, either for the purpose of revenge, extortion, persuasion or to satisfy some sadistic impulse; suffering alone is not sufficient to establish murder by torture, since suffering is involved in every violent death brought about by criminal means; there must be an intent that the deceased shall suffer, and such intent may be inferred from the condition of the deceased's body and the admissions of the accused.

However, in *People* v. *Bender, supra,* 27 Cal.2d 164, 177, it was held that:

''The killer who, heedless of the suffering of his victim, in hot anger and with the specific intent of killing, inflicts the

<hr>

*A hearing was granted by the Supreme Court on June 19, 1963.

severe pain which may be assumed to attend strangulation, has not in contemplation of the law the same intent as one who strangles with the intention that his victim shall suffer.''

The problem in the present case is whether the record discloses sufficient evidence indicating an intent on the part of defendant to attain the objectives required for a showing of intent to torture. These objectives designated in the case law on the subject may be either to cause the victim cruel suffering, or to extort or persuade the victim. Furthermore, the intention of the defendant can be to seek some personal satisfaction in revenge or in the satisfaction of some propensity. Here, the circumstances are clear that the defendant intended to cause cruel pain and suffering and derived some horrible sadistic satisfaction from striking the baby. On each occasion, he was in a sweating condition, and on these occasions he could not overcome his compulsion to strike the baby. True, he was fearful of the urge and testified that he thought of killing himself. The fact is that he did not kill himself; he killed his baby. (*People* v. *Jones*, 215 Cal.App.2d 341 [30 Cal.Rptr. 280].)

In *People* v. *Misquez*, *supra*, 152 Cal.App.2d 471, 480, somewhat factually similar, it was held that: ''The brutal and revolting manner in which defendant mistreated the child leads inevitably to the conclusion that he intended to cause cruel pain and suffering.'' It also held that where a killing is perpetrated by means of torture, the means used is conclusive evidence of the malice and premeditation and the crime is first degree murder, and that this intent may be inferred from the condition of the deceased's body and the admissions of the accused. There was sufficient evidence to support the finding of the jury in this respect. (*People* v. *Murphy*, 1 Cal. 2d 37 [32 P.2d 635]; *People* v. *Gilliam*, 39 Cal.2d 235 [246 P.2d 31]; *People* v. *Turville*, 51 Cal.2d 620, 632 [335 P.2d 678]; *People* v. *Misquez*, *supra*, 152 Cal.App.2d 471; *People* v. *Pickens*, 190 Cal.App.2d 138 [11 Cal.Rptr. 795]; *People* v. *Butler*, *supra*, 205 Cal.App.2d 437; *People* v. *Cooley*, 211 Cal.App.2d 173 [27 Cal.Rptr. 543].)

Attempted appeal from order denying new trial dismissed. Judgment affirmed.

Coughlin, J., and Stone, J.,* concurred.

---

*Assigned by Chairman of Judicial Council.