[Crim. No. 4691. Third Dist. Nov. 29, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. TOMMY G. EDGMON, Defendant and Appellant.

James T. Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Daniel J. Kremer, Arnold O. Overoye and Roger E. Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—The appeal is from judgment following a first degree murder conviction by a jury. Two contentions are raised: (1) insufficiency of the evidence to support the conviction; (2) inadequacy of defendant's trial counsel. We disallow both contentions.

At the outset we reiterate often stated rules:

■ Before a conviction will be reversed on the ground of insufficiency of the evidence it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support the judgment. (*People* v. *Newland* (1940) 15 Cal. 2d 678, 681 [104 P.2d 778]; *People* v. *Alonzo* (1958) 158 Cal.App.2d 45, 47 [322 P.2d 42].) The reviewing court must assume in favor of the verdict the existence of every fact that could reasonably have been deduced from the evidence by the trier of fact. (*People* v. *Newland, supra,* p. 681.) It is the trier of fact that must be convinced of defendant's guilt beyond a reasonable doubt, not the appellate court. (*People* v. *Hillery* (1965) 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Robillard* (1960) 55 Cal.2d 88, 93 [10 Cal. Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].) ■ In order to justify reversal of a conviction for murder in the first degree on this ground the record must show that the evidence could not be interpreted as supporting the verdict. (*People* v. *Eggers* (1947) 30 Cal.2d 676, 685 [185 P.2d 1].)

## SUMMARY OF FACTS

Defendant killed his father, Jack Edgmon. The killing occurred during the early evening of May 5, 1967, in the kitchen of the Jack Edgmon home in Woodland. It was witnessed by the victim's aged mother, Lela McShan. Defendant, armed with a rifle, fired five shots into the victim's body. At the time of the shooting the victim was lying prone on the

kitchen floor. When he fired the shots defendant stood in the doorway of the entrance to the kitchen from the back porch. The shooting was preceded by a fight between the two men; that fight was preceded by a quarrel.

At approximately 5 p.m. of the date of the shooting, Jack Edgmon had returned from a day of fishing. He had been drinking. His wife, Myrtle Edgmon, mother of defendant, testified her husband was intoxicated. A blood sample drawn after his death (at 9:45 p.m.) showed a blood alcohol concentration of .22.

Defendant, age 27, had left his place of employment at 4:30 p.m. He went to the shop of a mechanic who was repairing his car to check the progress of the work of repair. He had expected the automobile to be ready. It was not. The mechanic had been recommended by defendant's father. Defendant then went to his father's house where a conversation between the two "boiled up" into an argument. Mrs. Myrtle Edgmon and Mrs. McShan witnessed this argument.[1] The altercation terminated temporarily with a statement by defendant, "Just forget it." "Forget about the whole thing." He then left the house, slamming the door.

The homes of defendant and his father were back-to-back, with the backyards of each separated by a 5-foot 6-inch fence.

When defendant left his father's home the latter followed him. Jack Edgmon stopped at the back porch and picked up the butt of a fishing pole. Mrs. Edgmon followed her husband expecting him to become violent. Although there is conflict in the evidence as to exactly what occurred in the backyard, it is clear there was a physical battle of great intensity. Mrs. Edgmon testified that her husband struck defendant with the pole butt. She saw her son holding a white chair between himself and his father.[2] When the father struck defendant, Mrs. Edgmon ran back to the porch. En route she saw her husband coming toward their house with his head bleeding. A Mr. and Mrs. Mattaboni, who were neighbors, were prosecution witnesses. They testified they saw defendant and his father fighting in the yard. Defendant, they said, held a red chair, the father a white one. They saw defendant strike the

---

[1]The incident had been preceded by earlier arguments between father and son about the repair of the car. Defendant had called on his father "two or three evening before this" and was "kind of peeved."

[2]A police officer testified that Mrs. Edgmon had told him (at her home and shortly after the fatal shooting) that defendant had hit her husband over the head with a lawn chair; also that when defendant had left the yard he had said, "Wait until I get my gun." Mrs. Edgmon at the trial denied making that statement.

victim with the chair he was holding. The father fell to the ground bleeding. They then saw him retreat towards his back porch. They heard him cry out, ''Let's call the law.'' No injuries were observed on defendant's person. After the father departed defendant also left the yard. (See fn. 2.)

When the father reentered the house he had several wounds in the area of his head which could not have been self-inflicted or caused by a fall. All were severe, but in the opinion of the autopsy surgeon would not have caused death. Mrs. Edgmon wanted to take her husband to a doctor but he refused, requesting instead that she go get their daughter June. Mrs. Edgmon then went out to her car, leaving her mother-in-law, Mrs. McShan, with her husband. Before Mrs. Edgmon got into her car she heard shots and ran back to the house. Her stricken husband was lying on the kitchen floor. Defendant had fled by the time Mrs. Edgmon returned.

There is a conflict in the evidence as to the period of time which elapsed between the end of the scuffle in the yard and the shooting. The Mattabonis testified that they saw defendant, with his rifle, leaving the decedent's back porch about a half-hour after the fight. The testimony of Mrs. McShan and Mrs. Edgmon would support an inference that the elapsed time was perhaps half that.

The autopsy showed that five bullets entered the body of Jack Edgmon. The precise cause of death was a bullet which entered the heart after being deflected upward from the transverse process in his back.

Defendant went to the home of a sister after fleeing the scene and hid the rifle in its case under a mattress. He then negotiated a car swap with a friend and drove the car so obtained to the Yreka area. He subsequently surrendered himself to his parole officer.[3]

Defendant testified in his own behalf and did not deny the events up to and including commencement of the backyard brawl. However, he testified that he had no memory of the events which occurred after he was struck by his father with the butt of the fishing pole,[4] until he found himself sitting next to a tree in his father's backyard with his rifle beside him.

---

[3]Defendant admitted a prior felony conviction for armed robbery in 1958, committed when he was 17 years old.

[4]The fishing pole butt had bloodstains and hair on it when it was recovered. Analysis showed the bloodstains to be of decedent's blood type (A), and that the hair could have come from decedent.

### THE QUESTION OF SUFFICIENCY OF THE EVIDENCE

■ Defendant argues that the evidence presented is not sufficient to support a conviction for first degree murder, contending that the jury should have returned a verdict of voluntary manslaughter or, at most, second degree murder.

On the facts of this case the validity of the jury's verdict depends upon evidence, substantial in nature, sufficient to support a finding of a wilful, deliberate, premeditated killing with malice aforethought. (Pen. Code, § 189.) Alternatives might have been a verdict of voluntary manslaughter on the theory that the killing was without malice upon a sudden quarrel or heat of passion (Pen. Code, § 192, subd. 1), or a verdict of second degree murder on the theory that the provocation, although insufficient to negate malice, was sufficient to negate premeditation. (Pen. Code, § 189; see *People* v. *Heslen* (Cal. 1945) 163 P.2d 21, Cal.Sup.Ct., mod. 27 Cal.2d 520 [165 P.2d 250].)[5]

■ Malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. (Pen. Code, § 188; *People* v. *Wolff* (1964) 61 Cal.2d 795, 819-820 [40 Cal.Rptr. 271, 394 P.2d 959].) Penal Code section 189 includes within the definition of first degree murder that which is "perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing. . . ." ■ " ' "Deliberation means careful consideration and examination of the reasons for and against a choice or measure. . . ." ' " (*People* v. *Feasby* (1960) 178 Cal.App.2d 723, 730 [3 Cal.Rptr. 230], hear. den.) It is an antonym of hasty, impetuous, rash and impulsive. (*People* v. *Hilton* (1946) 29 Cal.2d 217, 222 [174 P.2d 5].) ■ " ' ". . . The verb 'premeditate' means to think on and revolve in the mind beforehand; to contrive and design previously." ' " (*People* v. *Feasby, supra,* 178 Cal.App.2d at p. 730.) ■ When it is claimed that the killing is by a wilful deliberation and premeditation other than poisoning, lying in wait or by torture, there is necessity of an appraisal involving something more than objective facts. (*People* v. *Wolff, supra,* 61 Cal.2d at p. 820.) There must be reflection

---

[5]The jury might also have found appellant not guilty of any crime had it believed his defense of unconsciousness. (Pen. Code, § 26, subd. Five; *People* v. *Anderson* (1965) 63 Cal.2d 351, 366 [46 Cal.Rptr. 763, 406 P.2d 43]; *People* v. *Gorshen* (1959) 51 Cal.2d 716, 727 [336 P.2d 492].)

and it must be substantially more than may be involved in a specific intent to kill. (*Id.* p. 821.) ▇ Measurement of premeditation and deliberation in units of time, however, is not undertaken by either statute or case law. " '. . . The true test is not the duration of time as much as it is the *extent of the reflection.*' " (*Id.* p. 821, quoting from *People* v. *Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7]; see also *People* v. *Holt* (1944) 25 Cal.2d 59, 89-90 [153 P.2d 21].) Premeditation and deliberation may be shown by circumstantial evidence. (*People* v. *Robillard* (1960) 55 Cal.2d 88, 95 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].)

▇ By reiteration we emphasize some of the facts summarized above which have convinced us the jury's verdict of first degree murder must be sustained. As to the facts before the killing defendant's statement "Wait until I get my gun" is significant. Although an argument and fight had occurred, the jury reasonably concluded an ample "cooling off" period had followed. If the father had been the aggressor, substantial evidence showed the serious punishment already inflicted by defendant upon his intoxicated father— enough to render him apparently helpless—should have dissipated whatever provocation had originally existed. (See *People* v. *Jones* (1963) 215 Cal.App.2d 341 [30 Cal.Rptr. 280] (hear. den.) dictum; *People* v. *Worthington* (1898) 122 Cal. 583 [55 P. 396].) Regarding events at the time of shooting, we note the nature and number of wounds inflicted. (*People* v. *Harrison* (1963) 59 Cal.2d 622, 628 [30 Cal.Rptr. 841, 381 P.2d 665].) Seven or eight shots were fired, five of which entered the victim's body. The evidence was strong that the gun (not hair-triggered) was deilberately aimed and fired. Defendant had to open the back door to reach and kill his presumably already incapacitated and defenseless father. (*People* v. *Feasby, supra,* 178 Cal.App.2d 723, 731.) Defendant's behavior after the killing is pertinent. (*Id.* p. 731.) His gun with all fingerprints (inferably) wiped off was found hidden at his sister's house. When found it had been reloaded after the shooting—ready for action. He traded the car under repair for another and fled to Siskiyou County. Although we have explained above that no particular period of time need elapse between a passion-producing quarrel and the subsequent killing, the fact that a considerable period of time did elapse here between defendant's announced intention, "Wait until I get my gun," and his suiting of action to his words is important.

We hold that substantial evidence of deliberation and premeditation was not insufficient as a matter of law. It was therefore a question of fact exclusively within the jury's province to resolve. (*People* v. *Lookadoo* (1967) 66 Cal.2d 307, 315 [57 Cal.Rptr. 608, 425 P.2d 208].)

The evidence as a whole supports the conclusion (1) that the killing did not occur in the heat of passion upon sufficient provocation but rather after the expiration of a period of time in which the passion of a reasonable man would have cooled; and (2) that the killing, with malice, occurred after a period of premeditation and deliberation.

### THE QUESTION OF CLAIMED INADEQUACY OF ASSIGNED TRIAL DEFENSE COUNSEL

The foregoing facts while sufficient to sustain a jury conviction of defendant for first degree murder are not such as to preclude a reasonable verdict of either of the lesser crimes—second degree murder or voluntary manslaughter. No motion for a new trial was made on behalf of defendant. Penal Code section 1181 specifies eight grounds upon which a motion for a new trial may be made. The sixth ground specified is: "When the verdict . . . is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he is convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial. . . ."

The new trial motion is a powerful weapon in the arsenal of the defense in a criminal case. It is particularly important to a defendant who has been found guilty of a capital offense. There the shadings between mature wilful premeditation and deliberation and malice absent such deliberation are subtle. Superficially considered, the omission of a new trial motion after a first degree murder conviction, in a case presenting some possibility of reasonable doubt would seem to establish inadequate representation by counsel ipso facto. The duty to move would seem to be clear even though the sole possible moving ground is that the verdict is contrary to the evidence. The fact that substantial evidence supports a first degree murder verdict should not foreclose a new trial motion. While it is incorrect to speak of the judge as being a thirteenth juror (since he does not deliberate with the jury), he is required when a new trial motion is made to weigh the evidence independently (which a reviewing court may not do).

(*People* v. *Robarge* (1953) 41 Cal.2d 628, 634 [262 P.2d 14] ;
and see cases generally cited in Witkin, Cal. Criminal Pro-
cedure (1963) Judgment and Attack in Trial Court, § 566,
pp. 574-575.) The judge's power to modify the judgment by
reducing the offense or degree has already been mentioned.
Therefore, although the chances that the judge actually will
grant such a motion may seem slight, vigilant advocacy would
usually demand the effort.[6] The leading California case on the
question of reversal for inadequate representation by trial
counsel is *People* v. *Ibarra* (1963) 60 Cal.2d 460 [34 Cal.Rptr.
863, 386 P.2d 487]. There defense counsel had failed to object
to the introduction into evidence of heroin claimed by the
prosecution to have been found in defendant's possession.
There were circumstances indicating the contraband had been
obtained as the result of an illegal search. Defendant had
testified the heroin had never been in his possession. Asked by
the trial judge if defendant objected to the introduction of
the heroin into evidence, defense counsel stated he would have
no grounds upon which to object since defendant had denied
it had ever been in his possession or had been taken from him.
On appeal our Supreme Court held there was inadequacy of
representation by defense counsel necessitating reversal. It
pointed out that the record demonstrated the attorney had
been unacquainted with the well-settled rule that the legality
of the search could have been challenged notwithstanding
defendant's denial he had ever had possession of the contra-
band. It was stated (on p. 466) that there was no merit in the
contention that counsel's failure to object would have weak-
ened the denial—because, says the court, there was no incon-
sistency in the assertion of an illegal search notwithstanding
defendant's denial. The opinion (*id.* p. 464) reasserted the
rule that to constitute reversible inadequacy of representation
it must appear "that counsel's lack of *diligence* or compe-
tence reduced the trial to a 'farce or a sham.' " (Italics
added.) But the court also states (*id.* p. 464) : "It is coun-
sel's duty to investigate carefully all defenses of fact and of
law that may be available to the defendant, and if his failure
to do so results in withdrawing a crucial defense from the
case, the defendant has not had the assistance to which he is
entitled." The opinion further sets forth (*id.* pp. 464-465) a

[6]It is also to be noted that the making of a new trial motion could
never harm a defendant since, should the motion be granted and result
on retrial in another first degree murder conviction, a death penalty could
not constitutionally be imposed. (*People* v. *Henderson* (1963) 60 Cal.2d
482, 496-497 [35 Cal.Rptr. 77, 386 P.2d 677].)

test suggested by *Brubaker* v. *Dickson,* 310 F.2d 30—that to be reversible the record must show inadequate representation by defense counsel precluding the presentation of defenses available to a defendant which has ''rendered his trial fundamentally unfair.''

If *Ibarra* applies to the facts of this case, it seems unlikely that such could be based on the lack of knowledge by defense counsel, an experienced public defender, of the provisions of Penal Code section 1181.

The facts recited above cursorily seem to illustrate that this was a case where the making of a new trial motion would be a ''must'' to a diligent defense counsel. This was a close case. Nevertheless, we are not convinced that the superficial answer to the problem is necessarily the correct one.

We can, at the outset, discard the proposal that a rule of automatic reversal be established as the aftermath of absence of a new trial motion. Such inflexibility would be attended by mischievous consequences. A self-effacing but adroit defense counsel could, with the consent of defendant, omit the motion. From that omission reversal would follow as the night the day. The rule would deservedly become known as the doctrine of ''invited planted error.'' The averages of obtaining a new trial, usually low,[7] would jump to 100 percent.

In the case before us there are explicit reasons why we cannot accept the theory of automatic reversal.

In the first place, the record before us discloses that after the first degree murder verdict had been returned defense counsel anticipated a penalty hearing before the jury. There was an overnight adjournment. When court reconvened the next day, defense counsel stated: ''At this time Mr. Edgmon desires to waive the jury in the penalty phase of this trial.'' The court, addressing itself directly to defendant, then warned and advised him of the legal effect of such a waiver. The waiver was reiterated by defendant personally. Defense counsel then submitted the matter on the guilt trial record. The prosecuting attorney then stated:

''. . . I would like to state, although I feel the verdict is certainly supportable by the evidence, it's the judgment of my office and myself that this is not a capital case and that

---

[7]Although it has been held that a trial judge lacks power to grant a new trial on his own motion (see cases cited in Witkin, Cal. Criminal Procedure (1963) § 573, p. 578), a conscientious trial judge who believes that the jury should have fixed the crime at a lesser degree may reveal his disagreement to counsel to the end that the defense attorney may offer such a motion.

the supreme penalty should not be imposed in this case in view of the mitigating evidence which was brought forth at the time of the trial."

Defense counsel concurred in the prosecutor's pronouncement. The court thereupon said: "I agree. I sat here and listened to the whole thing and I have the same impression you have, Mr. Ackley."

Had a bargain been made overnight in which defendant personally had agreed to waive a motion for a new trial in exchange for the prosecutor's recommendation to the trial judge against an imposition of the death penalty? Reviewing courts cannot be blind to the fact that such bargains are made.

"*The widely held view that prosecutors never bargain is a myth. As a practical matter they must in order to stay in business.* [Polstein, *How to 'Settle' a Criminal Case,* 8 Prac. Law. 35, 37 (1962).] . . .

"There is a broad range of plea arrangements currently used by prosecutors. The three most common are the sentence recommendation. . . .

"Under the sentence recommendation practice, the prosecuting attorney promises that he will recommend to the court a sentence favorable to the defendant [*or*] *will not seek the maximum penalty.* . . ." (Italics added.) (112 U.Pa.L.Rev. 865.)

This court does not condemn reasonable sentence bargaining[8] honestly made and scrupulously carried out. The authors quoted mentioned the benefits to the *prosecutor* from such bargains. Since it *is* a "bargain" there is a quid pro quo to the defendant. In the instant case the latter faced a possible death penalty after conviction of a particularly brutal patricide and after the jury had already rejected the urged lesser offenses of second degree murder and voluntary manslaughter.

It is true that the question whether or not sentence bargaining took place here is sheer speculation. On the face of the record one cannot say whether it did or did not. That is a dilemma a reviewing court faces in matters of this kind. To make a judgment under which we can be reasonably sure that justice is being done we would be compelled to stray beyond the record. That we are not permitted to do. It is stated in

[8]Plea bargaining has been expressly upheld by our Supreme Court in *In re Hawley* (1967) 67 Cal.2d 824, 828 [63 Cal.Rptr. 831, 433 P.2d 919].)

*People* v. *Merriam* (1967) 66 Cal.2d 390, 396-397 [58 Cal. Rptr. 1, 426 P.2d 161] : "It is elementary that the function of an appellate court, in reviewing a trial court judgment on direct appeal, is limited to a consideration of matters contained in the record of trial proceedings, and that 'Matters not presented by the record cannot be considered on the suggestion of counsel in the briefs.' (*People* v. *Hernandez* (1957) 150 Cal.App.2d 398, 402 [309 P.2d 969][9]. . . .)"

The record before us does not permit us to consider on appeal the argument that the absence of a new trial motion demonstrates inadequacy of representation.[10] This record has been combed for any evidence of inadequacy of representation by trial counsel other than the lack of diligence assumed by the absence of a new trial motion. We find none.[11]

Notwithstanding that this record is insufficient to establish the claim and that most records on appeal would be similarly inadequate, it does not follow that our law suffers a procedural vacuity preventing a defendant with a legitimate quarrel with the quality or representation by his trial counsel from gaining any redress. Seasonable collateral attack in a court of competent jurisdiction is not barred to him. That court could explore a claim of substance.

The judgment is affirmed.

Friedman, J., and Regan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 22, 1969. Peters, J., was of the opinion that the petition should be granted.

---

[9]There is an exception to the rule. A court of appeal under rule 23(b), California Rules of Court, may take additional evidence. The exception applies to a criminal appeal. (See *People* v. *Merriam, supra,* 66 Cal.2d 390, 397, fn. 6.) In *Merriam* it was stated that under the circumstances there present (an attempt to challenge constitutional defects of a charged prior conviction) the exception was of doubtful application, citing *People* v. *Benford* (1959) 53 Cal.2d 1, 6-7 [345 P.2d 928]. We deem that solution of the dilemma to be even more unsatisfactory under the facts here.

[10]In fairness to defense counsel on appeal it should be stated that the point was not urged at the outset. It was briefed by supplementary points and authorities requested by the court at oral argumnt.

[11]The argument now raised that defendant's trial attorney did not pursue to the fullest extent a contention that the victim was a violent man is negated by the record. Defendant's grandmother had denied, while his mother had affirmed, the father's violence towards his family. Both were prosecution witnesses. Additional pursuit of the theory would have required defense counsel to make the mother a defense witness, thus subjecting her to cross-examination which might well have been a very dangerous move. The decision against such a move was a tactical decision and, as we view it, a sound one.