[Crim. No. 2671.   Third Dist.   Oct. 18, 1956.]

THE PEOPLE, Respondent, v. KENNETH E. HOPPER, Appellant.

182

Robert C. Bienvenu and Leo J. Biegenzahn for Appellant.

Edmund G. Brown, Attorney General, and G. A. Strader, Deputy Attorney General, for Respondent.

VAN DYKE, P. J.—This is an appeal from a judgment entered upon a jury's verdict which found the appellant guilty of first degree murder with a recommendation of life imprisonment. Defendant also appeals from an order denying his motion for a new trial.

Appellant and the victim of the homicide had been living together as husband and wife for approximately 10 years. She was the mother of his four children.

Appellant contends that the evidence is insufficient to support a verdict of first degree murder. With this contention we agree, and this conclusion requires a somewhat detailed statement of the evidence. On July 5, 1955, at about 11:45 a. m., the sheriff's office of Stanislaus County received a call to investigate a death at the home of the appellant. A deputy sheriff proceeded to the home where he observed the body

of the decedent, Milladean Hopper, lying on a bed. The cause of death was ascertained to be hemorrhage due to laceration of the kidney. The autopsy physician described the injuries to the body of decedent as follows: There were multiple injuries, bruises and abrasions by fingernails. Although there were no external wounds on the head, there was considerable hemorrhage beneath the scalp. This injury could have been caused by a blow from a fist but was not particularly characteristic of such a blow. It was more suggestive of a wound occasioned by falling on the floor or hitting a large, flat surface. It could have been caused by a kick. It was possible that the force which caused the fracture of the three ribs in the back was a crushing force applied to the front part of the body rather than a blow to the back part, and this would be as reasonable an inference as the inference that the fractures were caused by a blow. Without the injury to the kidney, death would not have resulted, with the possible exception of the head injury. The kidney is more vulnerable to a posterior than to an anterior blow. The fractures of the three ribs and the injury to the kidney were just as consistent with the application of a crushing force as the application of a blow of any sort with any type of a blunt instrument. There was no break in the skull. Of the multiple small bruises around the knee, more than a dozen in total, a number of blows from a blunt object would have been necessary to cause them. The bruises on the back about the waistline would not necessarily have been caused by the same blunt instrument that caused the bruises on the knee, and in the opinion of the autopsy surgeon the same instrument was not responsible. It was possible that all of the bruises had been caused by a fall from a car. With regard to the bruises on the lower limbs, they could have been caused by blows from a blunt object, they could have been caused by several kicks, they could have been caused by several falls to a floor, and they could have been caused by a fall from a car onto a road surface on which there was loose rock. The autopsy surgeon gave her opinion that the most likely possibility was that the bruises were caused by kicks. Taking the entire body, the overall pattern of the injuries was, in the opinion of the autopsy surgeon, not consistent with a fall on a roadway, which opinion was influenced somewhat by the absence of what the autopsy surgeon called road burns. On redirect examination the autopsy surgeon gave as her opinion that the probable cause of the breaking of the ribs was a direct blow

which could have been from a boot, and that the rupture of the kidney was caused by a blow on the back of the body rather than by a crushing force applied to the front. The condition of the deceased's body, considering all the injuries thereto, was such that, in the opinion of the autopsy surgeon, the injuries were the result of a beating. The coroner testified that he had examined the body of decedent and that there were bruises all over the body which were not consistent with the type of bruises which would, in his opinion, have been received by a person falling from an automobile. Appellant and deceased had attended a Fourth of July dance, which they left about 2:30 a. m., in company with John McDonald. They entered appellant's car and drove to a restaurant, where the two men had something to eat, but decedent, stating she wanted to sleep, remained in the car. About 4:30 a. m. they drove to the Hopper residence, whereup McDonald stated he wanted to go home; and the three then drove to Oakdale, the two men in the front seat, Mrs. Hopper in the back. McDonald testified that during this ride the two seemed to be getting along well together and that, in fact, at one point in the conversation appellant had stated that decedent was the "best woman he ever had," and decedent had responded that appellant was "not so bad" himself. It was after McDonald got home and appellant had driven away that decedent received the injuries from which she died. While appellant and decedent were at the dance appellant danced with another woman and asked her if she was still going with a certain individual. When she replied she was, he told her that if she would get rid of that man he would get rid of decedent. There was nothing to explain what might have been meant by the term "get rid of." During the same evening decedent shouted at appellant while he was on the dance floor, stating that she was tired and wanted to go home. Appellant replied, "Damn it, you're drunk." She stamped her feet and said, "I still want to go home," whereupon he took her by the arm and with a jerking motion took her to the center of the floor where the two engaged in conversation with another man. On July 2, 1955, appellant and decedent went into a café and they were quarreling as they entered. Decedent was overheard to say, "If you ever do that again I am going to call the cops." The appellant replied, "Goddamn you, if you do it will be the last Goddamned thing you ever do. I'll kick the ——— out of you." Thereupon decedent began to cry. Several witnesses testified that on

several other occasions appellant struck decedent and made threats to kill her; however, all this occurred long prior to the homicide. For instance, one witness testified to such an incident in February of 1954. On this occasion appellant referred to decedent as ''a two-bit whore,'' grabbed her by the hair, threw her to the ground, stepped back and kicked her a severe blow, causing her to scream, whereupon two men came out of a dance hall and stopped the fight. Later on, the same night, when the Hoppers had returned home, this same witness observed appellant slap decedent and push her across the bed. The witness thereupon left the room and went to another part of the house. She later saw decedent with red marks on her face. On this occasion the appellant tried to persuade this witness to have intercourse with him but was refused. Another incident occurred in the early part of 1952. A witness had observed appellant chasing decedent around the house. She was yelling and screaming and he had a garden tool of some kind in his hand. (He explained this by saying that it was in jest.) Three days later the same witness observed that the decedent had a black eye. Another incident occurred in October of 1953 when a witness heard a commotion and observed appellant striking somebody whom she could not identify. However, she heard appellant say, ''God damn you, I'll kill you, you bitch, you God damned bitch, I'll kill you.'' Three or four days later this witness saw decedent and observed that her nose was swollen and her eyes were black. A week before the death of Mrs. Hopper and while the two were walking toward the Eatmor Cafe in Modesto, one witness observed Mr. Hopper as he walked beside decedent kick her ''in the seat'' and a few steps later strike her on her left shoulder. In January of 1954 the pair, accompanied by another, went to Stockton. During the trip the two argued continuously, and the companion heard appellant tell decedent to ''Shut up or I'll get you.'' The party returned to Modesto, arriving about 3 p.m. where Mrs. Hopper was scheduled to play the piano. Later that evening the witness testified he saw her bleeding at the mouth, with blood over her face and with disheveled hair. He asked a few minutes later of the appellant where decedent was, and appellant replied, ''If I ever catch her I will kill her.'' On this same occasion another witness saw her walking down the highway in a condition which the witness described as ''all bloody'' with blood over her face and the front of her dress.

He tried to talk to her, but she would not talk. He stated her face was "pretty well beat up." About that time appellant drove up in his car, and decedent got into the car with him, and the two of them drove away. Another witness, who had an orchestra which played for dances in the neighborhood, within a few days of the homicide went to the home of appellant for the purpose of engaging decedent in his band. She had two black eyes and during the conversation appellant stated, "she run off down the railroad tracks without her shoes on and when I found her I beat the hell out of her." While these incidents were testified to, covering, as is seen, a range of several years, it is also without dispute that the two lived together steadily and maintained a family residence. It is also without dispute that appellant, for several years at least and because he claimed to have such an injury to his back that he was unable to work, was without employment and without income, and that he, decedent and the four children were supported by the earnings of the decedent, who was a pianist and who was fairly steadily engaged in playing for various dance bands around the region. There was an utter absence of any showing of motive which would impel the appellant to kill his wife. He took an active part in assisting his wife in getting and in keeping her engagements as a pianist, generally going with her wherever she played and leaving the children in the charge of others. One witness testified that he tried to help her in her work and teach her "showmanship."

It is apparent that if the verdict of first degree murder is to be supported, it must be because the killing was one perpetrated by means of torture, or that it was a wilful, deliberate and premeditated killing. In *People* v. *Tubby,* 34 Cal.2d 72, 76-77 [207 P.2d 51], it was said:

"Torture has been defined as the 'Act or process of inflicting severe pain, esp. as a punishment in order to extort confession, or in revenge.' (Webster's New Int. Dict. (2d ed.).) The dictionary definition was appropriately enlarged upon by this court in its original opinion in *People* v. *Heslen,* *[Cal.] 163 P.2d 21, 27, in the following words: 'Implicit in that definition is the requirement of an intent to cause pain and suffering in addition to death. That is, the killer is not satisfied with killing alone. He wishes to punish, execute

*A rehearing was granted on November 29, 1945. The final opinion is reported in 27 Cal.2d 520 [165 P.2d 250].

vengeance on, or extort something from his victim, and in the course, or as the result of inflicting pain and suffering, the victim dies. That intent may be manifested by the nature of the acts and circumstances surrounding the homicide.' . . . The Colorado Supreme Court has declared in similar terms that as an essential of torture physical pain must be inflicted as a means of persuasion, punishment or in revenge. (*Townsend* v. *People*, 107 Colo. 258, 265 [111 P.2d 236].) In holding that a murder by strangulation was not necessarily murder by torture this court has stated: 'The killer who, heedless of the suffering of his victim, in hot anger and with the specific intent of killing, inflicts the severe pain which may be presumed to attend strangulation, has not in contemplation of law the same intent as one who strangles with the intention that the victim shall suffer. (*People* v. *Bender*, 27 Cal.2d 164, 177 [163 P.2d 8].)

"In determining whether the murder was perpetrated by means of torture the solution must rest upon whether the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity. The test cannot be whether the victim merely suffered severe pain since presumably in most murders severe pain precedes death."

In *People* v. *Tubby*, the defendant was seen to strike an aged man who was in the front yard of his residence. This act was observed by neighbors who shouted at him to cease. The defendant thereupon seized his victim by the hair of the head and dragged him into his residence and there proceeded to pummel, strike, and drag the victim about until, when the officers arrived, they found the victim seated in a chair in which he had at last been placed by the defendant, suffering from injuries from which he later died. As stated in the dissenting opinion in amplification of the statement of facts in the opinion by the majority, at page 81:

"The evidence clearly indicates that defendant chased his victim about the house inflicting terrific punishment upon him. There was blood on the porch, and on the walls and floor of practically every room in the house. The stove and stovepipe had been knocked out of place and some of the furniture had been broken during the affray. When the officers arrived, they found deceased had been beaten 'practically beyond recognition.' Physical examination showed that deceased's nose 'was crushed almost flat'; that his eyes were

swollen shut; that there was a fracture of the lower jaw and a complete fracture of the upper jaw; that there were several fractures of the skull; that the brain had been 'split completely open' and 'was literally pulverized over the back portion of the two frontal sinuses.' Other injuries were described by the doctors, including abdominal injuries, but the foregoing recital sufficiently shows the nature and severity of the resulting damage.''

The majority declared that the record was devoid of any explanation of why the defendant might have desired his stepfather to suffer. It was noted that the only testimony concerning the relationship between the two men was that the deceased and the defendant were on amicable terms prior to the attack, and concluded:

''. . . The record dispels any hypothesis that the primary purpose of the attack was to cause the deceased to suffer. When death results under the circumstances here shown the homicide cannot be said to constitute murder by torture in the popular, dictionary, or legal sense. The evidence is therefore insufficient as a matter of law to support the verdict on the theory that the homicide was murder by torture.''

In the case on appeal the evidence was without conflict that the relations between the appellant and the decedent, during the time when McDonald was in their company, were amicable even to the point of being affectionate. It is true there was testimony of physical assault several days prior thereto. There were also incidents testified to at widely separated intervals, going back as we have noted for several years, wherein physical assaults of varying severity were committed against decedent by appellant. But these things furnish no light as to what occurred when, after leaving McDonald at his home, the pair drove toward their own residence. We do not know whether there was provocation, whether there was a prolonged assault, whether or not the attack made was sudden, violent and furious, with, as we must assume, the intent to kill. We do not know, and we cannot infer, that over and above the intent to kill was the intent to torture. The record on this issue leaves us wholly to speculation and is insufficient to sustain the first degree verdict upon the theory that the killing was perpetrated by means of torture, ''in the popular, dictionary, or legal sense.''

What we have heretofore said has a direct bearing, also, on the issue of premeditation. The following appears in *People* v. *Bender*, 27 Cal.2d 164, 179 [163 P.2d 8], quoting from

and citing *People* v. *Howard,* 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]:

". . . 'When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree.'"

In the Bender case, as in this case, there was substantially no evidence casting light on either motive or intent at the time of the killing; and there, as in this case, there was evidence of marital discord, although the picture in the Bender case of the marital association was darker and portrayed a much more consistent lack of harmony than is shown by the evidence in this case. There, also, the jury was required to reject the testimony of the defendant that denied the killing. Said the Supreme Court on page 179:

"On the other hand, if the testimony, letters, and declarations of defendant are considered as a whole they show that the marriage of defendant and deceased began inauspiciously when defendant failed to tell deceased that his previous marriage had not been dissolved, and that some eight months later the violent disagreements which characterized the marriage culminated, after several hours of drunken quarreling, in murder. The picture of the events which led up to the murder and the events which followed it is a consistent one, interrupted only by the defendant's denial that he killed his wife. This picture suggests reasons for and the facts of quarreling between decedent and defendant but leaves only to conjecture and surmise the conclusion that defendant either arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation. Overwhelmingly opposed to such conjecture or surmise, and consistently evidenced by every circumstance is the rationale of a tempestuous quarrel, hot anger, and a violent killing."

In *People* v. *Thomas,* 25 Cal.2d 880, 898 [156 P.2d 7], it was declared that an instruction that "If . . . specific intent exists at the time of such unlawful killing, the offense committed would of course be murder of the first degree" was erroneous, and that to hold otherwise would be to emasculate the statutory difference between first and second degree murder; that "The word 'specific (adjective) means 'Precisely formulated or restricted; . . . definite, . . . explicit; of an exact or particular nature' (Webster's New Int. Dict. (2d ed.)) while 'deliberate' (as an adjective) means 'formed,

arrived at, or determined upon as a result of careful thought and weighing of considerations; as, a deliberate judgment or plan; carried on coolly and steadily, esp. according to a preconceived design; . . . Given to weighing facts and arguments with a view to a choice or decision; careful in considering the consequences of a step; . . . Slow in action; unhurried; . . . Characterized by reflection; dispassionate; not rash.' " Finally it has been held that the evidence must show that the intent to kill was thus arrived at if the killing is to measure up to first degree murder. (*People* v. *Tubby, supra.*) The testimony of occasional threats and acts of violence committed by appellant against decedent which were widely separated and interspersed by amicable relations throws no light whatever upon whether or not appellant is guilty of a wilful, deliberate and premeditated murder. Some time after McDonald left appellant and his wife, this amicable relation changed and he beat her as he had done before. But the record is barren of proof that this beating differed from others in that it was done in carrying out a preconceived design to kill, deliberately arrived at.

The coroner of Stanislaus County was called as a witness and was permitted to give an opinion that the character of the abrasions found upon the body of decedent were not such as would have appeared had her body fallen from a moving car. Appellant's counsel objected that he was not qualified as an expert on such a matter and here contends that the court erred in overruling that objection. ■ The witness testified that he had been a licensed mortician for 21 years, had been a deputy coroner for 8 years; had seen at least 15 or 20 dead bodies which had been thrown from or had fallen from a moving vehicle and was familiar with the abrasion markings resulting from such a fall. On cross-examination to test his qualifications he said that he was not an expert at medicine nor an expert in the nature of bruises generally; that he could not describe pathologically the various types of bruises found for lack of expert training. Over objection to his qualifications he then testified that he had observed on the bodies he had seen and which had fallen or been thrown from moving vehicles areas of abrasion where the body struck the road; that by abrasions he meant a scraping off of the skin. He said, "The skin is more or less scraped off, especially on the high spots, the shoulders, ribs, knees, hips and things of that nature. There may be some contusions, but they nearly always are accompanied by this abraded or scraping wound

that goes along with it." If the subject matter was one for expert testimony, then we think the coroner was qualified. The importance of the testimony arose because the appellant contended the decedent's death came about by her falling from his automobile as he drove along the road. If, from the coroner's experience, he could say as he did that, when a person falls from a moving vehicle and strikes a road surface, he will suffer characteristic abrasions of the skin on and about body prominences, he is qualified to express an opinion as to whether or not the abrasions he found on the body of the decedent had the appearance of such characteristic abrasions. This witness was not attempting to describe or to testify concerning bruises; his testimony was limited to surface abrasions.

Appellant contends that the court erred in receiving the opinion evidence of the coroner and of the autopsy surgeon as to the probability that the abrasions they found on decedent's body had been received by a fall from appellant's car. His argument is that the subject was not one for expert testimony, because it falls within knowledge commonly possessed to the point that the jury should not have been subjected to opinion evidence as to the cause of the abrasions. We do not agree. It is certainly not incredible that human bodies falling from a car and striking a road surface would receive abrasions peculiar to such an accident. Both witnesses had had considerable experience in determining that abrasions so received did possess an appearance which differentiated them from abrasions received otherwise. It was proper, therefore, to give the jury the aid which could be derived from an expression of an opinion by them as to the cause of the abrasions found on the body of decedent. Both witnesses testified that, in their opinion, those abrasions were not received by reason of a fall from a moving vehicle upon a road surface. Professor Wigmore has said the criterion for receiving opinion evidence from a qualified witness is: ". . . Can a jury from this person receive appreciable help?" (7 Wigmore on Evidence, § 1923.) In *Taylor* v. *Monroe,* 43 Conn. 36, 44, it is stated:

"The true test of the admissibility of such testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter, but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the

world, which renders their opinions founded on such knowledge or experience any aid to the Court or jury in determining the questions at issue.''

We think both these witnesses were qualified to express an opinion, and that no error was committed in receiving their testimony as such. Both had had the experience of examining and noting the characteristics of road abrasions or road burns as exhibited on bodies known by them to have suffered abrasions from falling from moving vehicles and striking upon a road surface. Both said that they had observed such characteristics and that there was a similarity in the road burns or abrasions so received. Both had examined the abrasions on the body of deceased. Both stated that, in their opinion, the characteristics of road burns were not present on the body of deceased. It would have been difficult, if not impossible, for these witnesses to describe the appearances upon which they based their opinion in such a way as to place the jury in the same situation which they were in when they arrived at their opinion. Under such circumstances it was proper for the court to take the testimony of these witnesses in order to aid the jury in the determination of whether or not the claims of appellant that his wife had fallen from his car and struck the road and thus received the injuries which caused her death were true or false.

Appellant contends that the court erred in admitting the testimony of the witness Minnie Wilson. She was the sole rebuttal witness called by the prosecution. In cross-examination the appellant had been subjected to numerous questions concerning his affection for decedent and his relations with her. He had testified, generally, that the marital association between the two had been amicable and affectionate. He had substantially denied all of the testimony that he had abused and beaten her on the occasions testified to by witnesses for the prosecution. At the close of his cross-examination, the following occurred: He was asked if he knew a Minnie Wilson and he said that he did; that he and his wife had taken her home after a dance; that his wife and he had met Minnie Wilson at a beer joint when she was crying and said her husband and she were having a lot of trouble; that she asked the Hoppers to take her home; that they agreed to do so; that appellant had been trying to get some beer before the ''beer joints closed'' and that Minnie Wilson had said she had plenty of whiskey at her place and if they would take her home she would give them some; that when they got there

she walked inside her door, said "just a minute" and that he waited; that she did not bring any whiskey; that he shouted at her, and when she came to the door, said "where's that whiskey?"; that she replied she didn't have any; and that he then said that she had told them she had some whiskey and would give it to him if the Hoppers would bring her home; that she replied, "You're just a dirty, no-good, lying son-of-a-bitch, I never said no such of a thing," whereupon he slapped her; that he did not "put her in the hospital," but that he had paid a fine as a result of his striking her. At this point objection was made that the subject of the cross-examination was improper as having no relevancy to the crime charged. The objection was overruled. He said he did not go into her house but had opened the screen door behind which she stood and slapped her in the face. He was asked if he made any advances toward her and said he had not. In rebuttal Minnie Wilson was called to the stand. She testified that the Hoppers had taken her home and that she had got out of the car, gone into her house, hooked the screen door and laid down across her bed; that in three or four minutes there was a knock on the door to which she did not respond; that the knock was repeated several times and still she did not respond; that then the person knocking broke in by breaking the hook off the screen door; that she then said "Who's that?" and the person replied, "What do you want to know for?"; that she said, "Well, you'd better get out of here; I'm looking for my husband any minute"; the person replied, "Husband or no husband, I'm not leaving until I get what I want"; that thereupon she was attacked and did not remember anything more until the next morning when she was found wandering around her yard in a dazed condition, badly beaten up and was taken to the hospital. She described her injuries as follows: "The blood was dripping out of my hair and my clothes; you could have wrung the blood out of them. My ear was torn or cut, whatever it was happened, to here all the way back here at the side of my head (indicating). My eye was cut here. I was bashed in here. This knuckle was knocked out over here. I had had this here tooth capped, it tore the cap, knocked the cap off of the tooth, and tore the ligaments in this eyeball loose, and my eyeball had fallen down, . . . had torn the ligaments loose to my eyeball; . . . this thigh all up and down here, looked like it had been kicked; big bruises on me." She did not testify that she had

been sexually assaulted. Notwithstanding the objections made and overruled as to the questions concerning Minnie Wilson which had been addressed to the appellant, the foregoing testimony of Minnie Wilson herself came in without objection. On cross-examination, however, the witness testified that during the altercation she did not know who her assailant was. She said that because it was dark she did not see or recognize and was unable to identify the man who assaulted her, and it finally appeared that of her own knowledge she still could not testify that defendant was that man. Motion was thereupon made to strike her testimony, and the motion was denied, the court stating that he did so because appellant had testified on cross-examination that he had gone to Minnie Wilson's front door, opened the screen door and had slapped her because of her refusal to give him the whiskey she had promised.

Section 1323 of the Penal Code provides:

"A defendant in a criminal action or proceeding cannot be compelled to be a witness against himself; but if he offers himself as a witness, he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief. . . ."

█ This does not mean that the cross-examination must be confined to a mere categorical review of the matters, dates, or times mentioned in the direct examination. It may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given by him on his direct examination. █ If a defendant takes the stand and makes a general denial of the crime with which he is charged, the permissible scope of cross-examination is very wide, and he cannot by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts to which he testified. █ He can be cross-examined with respect to facts or denials which are necessarily implied from the testimony in chief as well as with respect to facts which he expressly states. (*People* v. *Zerillo*, 36 Cal.2d 222, 227 et seq. [223 P.2d 223].) █ We have heretofore sufficiently reviewed the testimony of the prosecution and that of the appellant when he took the stand in his own behalf to justify the generalization that not only had he denied his guilt generally, not only had he denied specifically most of the instances of violent assault upon his

wife, but he had also given a general picture of amicable relations between them and had offered an explanation of her death which directly conflicted with the theory presented by the prosecution. Under such circumstances his cross-examination could properly range wide. The incident concerning which he was asked with respect to Minnie Wilson occurred almost four years before the death of appellant's wife. No objection, however, was made on the ground of remoteness, and had it been made, it could have been properly overruled as affecting the weight and not the admissibility of the evidence in view of the fact that the state was charging that his wife came to her death by a beating administered by him, his denial thereof, and of the testimony of the prosecution as to his frequent physical assaults upon her, including of course a showing by implication that his character was that of a man given to sudden storms of anger during which he readily resorted to his fists in assaults against a woman to whom he bore the relation of husband and who was his chief mainstay and support in life. His denial of these matters, his attempts to explain them away as either never having happened or as being things done in jest brought his character and his addiction to violent outbursts and of physical assault with little or no provocation sharply to the fore. It was, therefore, permissible to examine him concerning like matters even though in the incident inquired about, the beating, if it occurred, was administered by him to a woman not his wife. When he denied the assault, it was permissible also for the prosecution to call Minnie Wilson to establish that the assault had occurred, and certainly if he was the assailant, then the ferocity of the attack with no provocation save his disappointment in not obtaining the whiskey which he thought the woman would give him for taking her home, was material to the issues presented by his own testimony. We cannot sustain the appellant's contentions that the testimony was improperly admitted. Neither can we sustain appellant's contention that the testimony of Minnie Wilson should have been stricken on motion. To be sure, she said she did not and could not identify her assailant as being appellant, because it was dark and she could not see him. Nevertheless, the other circumstances made it a fair inference that he was the assailant. He himself had testified that he was there, that he had taken her home, that he had done so on a promise that she would deliver whiskey to him, that when she failed to do so he tore open the screen door and slapped her. These cir-

cumstances warranted an inference that the vicious assault which she testified to was in fact inflicted by him, even though according to his version he stopped with a single slap.

■ The court instructed the jury that, although evidence had been offered in the case for the purpose of showing that on occasions prior to the 5th of July, 1955 (the day Mrs. Hopper met her death), defendant had beaten and struck his wife and on one occasion had beaten another woman, that such evidence had been received for a limited purpose, not to prove distinct offenses or continuing criminality, but for such bearing, if any, as it might have on the question whether the defendant was innocent or guilty of the crime charged; that the jury were not permitted to consider the evidence for any other purpose; that the value of the evidence of beating of decedent depended on whether or not it tended to show a course of conduct of the defendant toward her on prior occasions which ultimately culminated in her death and on whether or not such prior acts indicated a motive for the crime charged in the action; that the value of the evidence of the beating of decedent and of the beating of another woman depended on whether or not the prior acts viewed with the act of which the defendant was accused showed a common pattern, scheme or design. Appellant contends that the giving of this instruction constituted error. We cannot sustain appellant's contentions with respect to this instruction. It was not unfair to him and did not misstate the law. In general, appellant's argument in support of this point is addressed to the admissibility of the evidence, and we have already passed upon that matter. There was a pattern of behavior evidenced by the testimony of witnesses referred to in the instruction which aided the inference that appellant had killed decedent while beating her.

■ Appellant contends that the trial court erred in admitting testimony as to bruises that had been seen on the person of decedent at various times throughout a five-year period preceding her death. Appellant says that these highly prejudicial remarks were admitted into evidence over objection but upon a general assurance from the district attorney that he would tie such testimony in with the appellant, and that such tying in was not effected. It would serve no good purpose to relate the testimony on these matters more in detail than has been done. The testimony of witnesses concerning the various times when they had seen evidences on her face and body that she had received a beating was accom-

panied in each instance with testimony of his proximity and of admissions sufficient to justify the inference that the marks and bruises observed had been inflicted by him.

Finally, appellant contends that he was denied a fair and impartial trial because of the attitude and comment of the trial judge, which reflected his feelings toward the appellant and which were conveyed to the jury and everyone else in the courtroom. Appellant requests us to "ponder the entire record and the cumulative effect of the rulings of the trial court in determining whether or not there was an adverse effect upon the rights of defendant by the trial court's attitude throughout the case." This court has complied with the appellant's request that we consider the whole record. We find nothing in that record to substantiate the charge of misconduct or of bias on the part of the trial judge.

For the reasons given, the order denying the motion for a new trial is affirmed. However, acting under the authority given us by sections 1181 and 1260 of the Penal Code, the judgment is modified by reducing the degree of the crime to murder of the second degree, and as so modified the judgment is affirmed. The cause is remanded to the trial court with directions to sentence the defendant to imprisonment for the term prescribed by law for murder of the second degree.

Peek, J., and McMurray, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.