Filed 8/1/25  P. v. Joyave CA5
Opinion after recalling remittitur

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CODY LEVI JOYAVE,<br><br>    Defendant and Appellant. | F085841<br><br>(Super. Ct. No. BF190203A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Cody Levi Joyave admitted he killed his fiancée L.M., but denied he premeditated or deliberated her death.  A jury convicted Joyave of first degree murder.

On appeal, Joyave claims there was insufficient evidence to support his first degree murder conviction. He argues his conviction should be reduced to second degree murder because the evidence showed he acted as the result of a rash impulse. He also requests we independently review L.M.'s high school records that were reviewed by the trial court to determine whether the court abused its discretion in concluding the records were immaterial to the defense and, therefore, not discoverable.

We find no error and affirm the judgment.

## PROCEDURAL BACKGROUND

On July 8, 2022, the Kern County District Attorney filed an information charging Joyave with premeditated first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189; count 1). It was also alleged as to count 1 that Joyave used a knife during the commission of the crime (§ 12022, subd. (b)(1)) and aggravating factors:[2] the crime involved great violence and great bodily harm (Cal. Rules of Court, Rule[3] 4.421 (a)(1)), Joyave was armed with or used a weapon at the time of the commission of the crime (rule 4.421(a)(2)), the victim was particularly vulnerable (rule 4.421(a)(3)), Joyave engaged in violent conduct that indicates a serious danger to society (rule 4.421(b)(1)), Joyave lied to officials concerning the manner of L.M.'s death (rule 4.421(c)), and Joyave deleted incriminating text messages from his cell phone (rule 4.421(c)).

---

[1] Undesignated statutory references are to the Penal Code.

[2] We note the information only states "aggravating factors," however, the People's sentencing brief alleges the specific aggravating factors the trial court considered when sentencing Joyave as set forth here. The court concluded that although the information was not amended to identify the specific aggravating circumstances, the information gave notice to defense counsel that these factors would be alleged. Therefore, the court found it proper to consider the factors alleged in the People's sentencing brief. The parties do not challenge this ruling on appeal.

[3] Undesignated rule references are to the California Rules of Court.

On November 22, 2022, a jury convicted Joyave of premeditated first degree murder. The jury also found true that Joyave used a knife during the commission of the crime. On March 1, 2023, in a bifurcated court trial[4] outside the presence of the jury, the court found true the following aggravating circumstances: the crime involved great violence and great bodily harm (rule 4.421(a)(1)), the victim was particularly vulnerable (rule 4.421(a)(3)), Joyave engaged in violent conduct that indicates a serious danger to society (rule 4.421(b)(1)), and Joyave lied and deleted evidence (rule 4.421(c)). The court did not find true the aggravating factor that Joyave was armed with or used a weapon at the time of the crime (rule 4.421(a)(2)).[5]

On March 1, 2023, Joyave was sentenced to 25 years to life, plus one year for the knife use.

## FACTUAL BACKGROUND

### A. The Prosecution's Case

#### 1. Background

On May 20, 2022,[6] Joyave and L.M. had been in a relationship for about eleven and a half years. The couple had been together since the eighth grade.[7] They had been engaged for about four years. Joyave and L.M. had been living together in an apartment, however, they were planning to move in with L.M.'s mother on June 1. Joyave had been staying with a friend in Kern County, B.C., from May 18 through the late night of May 19. Joyave was sleeping on B.C.'s couch. B.C. and Joyave were planning to start a real estate business together and intended to travel to Los Angeles on May 20.

---

[4] Joyave waived his right to a jury trial on the aggravating factors.

[5] The trial court did not find true this aggravating factor because the court used it as a sentencing enhancement. (See, e.g. § 1170, subd. (b)(5).)

[6] All further dates are in the year 2022 unless otherwise specified.

[7] Joyave was 23 years old and L.M. was 22 years old on the day of the murder.

On the evening of May 19, L.M. and her mother communicated via text message. Around 11:30 p.m., after L.M. got off work, she went to her mother's house to pick up her dog. She was upset because she was unsure if she wanted to stay in a relationship with Joyave. L.M. believed Joyave was cheating on her. L.M. sent her mother a text message at about 11:55 p.m. when she returned home. Her mother never heard from L.M. again.

## 2. The Homicide

Joyave left B.C.'s house late on the night of May 19. In the early morning hours of May 20, at about 1:56 a.m., B.C. received a call from Joyave. They spoke for four minutes. Joyave was "panicked" and B.C. initially could not understand what he was saying. After about two to three minutes, B.C. finally understood Joyave. He told B.C. that he had returned from the gas station and found that L.M. had killed herself.

At about 2:10 a.m., Deputy Sheriff Nathan Pucilowski responded to the scene. Joyave admitted Pucilowski when he arrived. Pucilowski found L.M.'s body in the northwest corner of the apartment. L.M. was lying on the ground covered in blood with a large laceration to the front of her neck. She was wearing a t-shirt but was nude from the waist down. Pucilowski started chest compressions until relieved by medical personnel.

## 3. Police Investigation

Police located a knife near L.M.'s feet during their investigation of the crime scene. The knife was swabbed for DNA; swabs were also taken of L.M.'s hands and fingernails. Joyave's DNA could not be excluded from L.M.'s fingernail trimmings. Joyave's DNA was 21,000 times more likely to be present under L.M.'s right hand fingernails than a "random, unrelated Caucasian person." Joyave's DNA also was present under L.M.'s left hand fingernails. Both Joyave and L.M. could not be excluded from the mixture of DNA found on the knife, however, it was unclear if the presence of L.M.'s DNA was a result of her touching the knife or because her blood or saliva was present.

4.

Lead Detective Gabriel Romo also responded to the crime scene around 2:00 a.m. on May 20. He seized both Joyave's and L.M.'s cell phones and reviewed their contents. Cellular extracts were performed from both cell phones.

L.M. had been communicating with Joyave via telephone and text message during the time leading up to her death. On May 19, numerous text exchanges occurred between L.M. and Joyave. Joyave deleted his text messages to L.M. There were no texts between the couple on Joyave's phone after 8:00 p.m. on May 19 to 2:00 a.m. on May 20.

### 4. L.M.'s Autopsy

An autopsy of L.M. was performed. L.M. suffered from "multiple deep cuts to … the front of her neck." L.M. had a gaping wound to the neck just below the chin, extending from the mid-right side of the neck to the left side neck to the ear. Analysis of her neck indicated multiple points of impact with a sharp item. L.M.'s vena cava was severed, the major vein of the neck, which was fatal.

L.M. also suffered from blunt force trauma to her left forearm and the left side of her head around her left ear, resulting in bruising. These injuries suggested L.M. was hit or fell. L.M. had extensive eye hemorrhages. These latter injuries suggested neck compression or strangulation prior to death. The cause of death was sharp force injury to the neck; the manner of death was ruled a homicide.

### B. The Defense Case

At about 2:00 a.m., fire dispatcher Victoria Pritchett received a 911 call from Joyave. Joyave told Pritchett that L.M. asked him to get Gatorade from the gas station and when he returned, he found her "motionless on the floor" with blood everywhere. Joyave also told Pritchett there was a "knife close to her hands" so he believed she "cut her throat[.]" He said L.M. was not breathing and "felt cold."

Joyave testified on his own behalf. He had been in a long term relationship with L.M. and became emotionally and physically dependent on her. About "once or twice a year" Joyave and L.M. would break up for short periods of time, but they always got

5.

back together.  However, after high school their arguments increased and they began fighting every day about money, infidelity, and Joyave's "self-worth."  For example, L.M. would belittle Joyave and tell him he was "worthless," "lazy," or "stupid."  The verbal abuse increased in frequency.  Joyave and L.M. had been arguing about finances for about six years.  Joyave also believed L.M. had slept with one of his best friends and his stepbrother.  Joyave claimed L.M. physically abused him at times.  He was "afraid" of L.M., although he was about six inches taller than her.

Joyave was also physically abusive to L.M.  In April 2022, Joyave choked L.M. until she became unconscious.  Then, Joyave sent L.M. a text message regarding the incident: "[w]hen your body seized up and stopped moving, the lifelessness in your eyes, I just wish I could take that all back and just never do anything.  I just want to fix everything with you[.]"  When L.M. asked Joyave how she got on the ground he said, "you just stopped moving entirely .…" and "[y]our legs gave up."

About six days later, Joyave tried to commit suicide by taking multiple Tylenol pills because L.M. said she was going to leave him and because of the choking incident.  After Joyave's attempted suicide, he lost his job.  The loss of Joyave's job added to the couple's financial stress.

On May 18, after an argument with L.M., Joyave left the apartment and stayed with B.C.  He told L.M. he was leaving with B.C. to start a business venture in Los Angeles.  Although Joyave's trip got postponed, he lied to L.M. and told her he was leaving for Los Angeles later that night or the morning of May 19.  Joyave stayed at B.C.'s house in Kern County through late at night on May 19.

From May 18 through May 19, Joyave and L.M. fought via text message and over the phone regarding dishonesty, money, and infidelity.  Hours before the killing, L.M. texted Joyave and requested to video chat, but Joyave refused.  L.M. threatened to leave him.  Joyave sent L.M. a text message that said, "[y]ou [are] seriously making a mistake."

6.

He also sent a text that said, "[y]ou will regret this decision" and thereafter, "[y]ou will regret everything you just said."

Late in the evening on May 19, Joyave showed up unexpectedly at their apartment before she returned from work. When L.M. got home later that night, they continued to fight over dishonesty, money, and infidelity. At some point, Joyave left the apartment to get L.M. something to drink; however, he returned to the apartment soon after because the store was closed. Once Joyave returned from the store, the argument continued; L.M. hit and shoved Joyave. Joyave received scratches from L.M.'s physical attack. During the argument, L.M. was nude from the waist down. According to Joyave, L.M. would normally take her pants and panties off to get "comfortable" but leave her bra on.

Then, L.M. left the room. When she returned, L.M. was holding a kitchen knife in her right hand. Joyave was scared. After further argument, L.M. made "one quick lunge" and got on top of Joyave with the knife. Eventually, Joyave wrestled L.M. off, she dropped the knife, and he rolled on top of her. Then, L.M. hit Joyave in the head with the dog bowl. L.M. told him he was "better off dead." L.M. said "belittling" things to Joyave.

L.M. got the knife a second time, she "lunged" on top of him again, and thrusted the knife towards Joyave's neck and chest area. Joyave hit the back of her hand on the wall, and she dropped the knife. Joyave got on top of L.M. and armed himself with the knife; however, L.M. pushed his arm upward and tried to make him use the knife on himself. L.M. yelled and said he "should just die because that [is] what [he is] better off doing."

Joyave "snapped out of everything" and "used the blade on [L.M.]." He was "depressed at the … things [L.M.] said, and … also angry[.]" Joyave said he "slash[ed] [L.M.'s] throat" one time while he was on top of her. Joyave did not have blood splatter

7.

on him, although blood was found splattered nearly eight to nine feet from L.M.'s neck.[8] He claimed the killing was an accident, he "snapped", and he did not intend to hurt L.M. Joyave also claimed he acted in "self-defense."[9] He claimed L.M.'s neck wound was so big because she leaned towards the knife while he cut her throat.

After Joyave cut L.M.'s throat, he threw the knife away and "started panicking." L.M. began to crawl around and Joyave "walked out of the room." He kept going back and forth inside the room to check on L.M. to make sure she was not moving too much. Then, Joyave called B.C.

After calling B.C., Joyave called 911 and told the dispatcher L.M. committed suicide. Joyave initially lied several times to law enforcement and maintained that L.M. committed suicide. He eventually "kind of told [law enforcement] what had happened that night."

Joyave's friend, K.H., testified Joyave told him that L.M. physically abused him two years prior.

## C. Rebuttal

Joyave was interviewed by law enforcement on May 20 at about 5:00 a.m. Joyave claimed L.M. asked him to get her a Gatorade, and when he returned from the gas station, L.M. was on the ground face down. Joyave said the couple fought over money. He claimed the scratches on him were due to falling off the bed and then slipping in blood. He initially denied hurting L.M., but eventually admitted that he and L.M. had an argument when she pulled a knife out. Joyave told law enforcement he acted in self-

---

[8] The prosecutor suggested that since Joyave did not have any blood splatter on him that he had been behind L.M. when he slashed her throat, but Joyave insisted he was top of her.

[9] We note Joyave had two competing theories at trial. Joyave alleged he "snapped" out of rage because of the "belittling" things L.M. said to him during their argument. He also alleged that he acted in self-defense.

defense when he "stabbed her throat." He said he was standing up when he cut L.M.; he never mentioned that he was on the ground.

Joyave did not tell law enforcement that he snapped or acted out of rage when he killed L.M. None of the scratches on Joyave appeared to be caused by a knife. Joyave did not tell law enforcement that L.M. hit him or that he previously choked her.

L.M.'s mother and L.M.'s friend testified that L.M. was not a violent person. L.M. told her friend she was afraid of Joyave. L.M. also told her friend on the night before she was killed that Joyave was threatening her. On May 19 at 10:00 p.m., L.M. asked her friend to "save the screen shots" of the text messages Joyave sent to L.M. on the night he choked her into unconsciousness.

## DISCUSSION

### I. Evidence of Willful, Deliberate, and Premeditated Murder

Joyave contends that there was no evidence other than mere speculation that the murder of L.M. was premeditated or deliberate, and therefore the evidence was insufficient to sustain his first degree murder conviction. He requests his conviction be reduced to second degree murder. The People disagree, arguing there is substantial evidence to support Joyave's first degree murder conviction. We agree with the People.

### A. Sufficiency of the Evidence

In considering Joyave's claim, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt. [Citations.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "State and federal due process requirements are identical in this regard." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 87.) The reviewing "court may not 'go beyond inference and into the realm of speculation in order to find support for a judgment. A finding of first degree murder

9.

which is merely the product of conjecture and surmise may not be affirmed.' " (*People v. Memro* (1985) 38 Cal.3d 658, 695, overruled on another ground by *People v. Gaines* (2009) 46 Cal.4th 172, 181 fn. 2.) However, "[i]f the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

### B. Premeditation and Deliberation

A verdict of first degree murder committed with premeditation and deliberation requires more than a showing of intent to kill. (§ 189 [first degree murder is a "willful, deliberate and premeditated killing"]; CALJICa 8.20.) " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*).) "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly[.]" (*People v. Thomas* (1945) 25 Cal.2d 880, 900 (*Thomas*).)

Our California Supreme Court distinguished three categories of evidence of deliberation and premeditation: (1) planning activity prior to the killing, (2) evidence of motive, drawn from the defendant's prior relationship or conduct with the victim and (3) the manner of killing, establishing a preconceived design to kill. (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*).) As explained in *Anderson*, first degree murder verdicts are typically sustained by the appellate court when there is evidence of all three categories, where there is extremely strong evidence of prior planning activity, or where there is evidence of a motive to kill, in conjunction with evidence of either planning activity or a manner of killing that indicates a preconceived design to kill. (*Id*. at p. 27.) The three categories in *Anderson* are not exhaustive and were "intended to guide an appellate court's assessment whether the evidence supports an inference that the killing

occurred as the result of preexisting reflection rather than unconsidered or rash impulse." (*People v. Pride* (1992) 3 Cal.4th 195, 247.)

## C. Analysis

Joyave contends the evidence of first degree murder was insufficient to establish the killing occurred as the result of preexisting reflection but rather consisted of an unconsidered rash impulse hastily executed, which occurred in one quick stride or movement. (See, e.g. *Thomas, supra,* 25 Cal.2d at pp. 900–901 ["the express requirement for a concurrence of deliberation and premeditation excludes … those homicides … which are the result of mere unconsidered or rash impulse hastily executed"]; see also *People v. Beltran* (2013) 56 Cal.4th 935, 942 [a person who acts without reflection in response to adequate provocation does not act with malice].) Joyave argues there was not substantial evidence of planning, motive, or manner of killing to support an inference of premeditated murder.

Applying the *Anderson* factors and reviewing the facts adduced at trial in the light most favorable to the People, we conclude the record yields sufficient evidence to support the verdict under a theory of willful, deliberate, and premeditated murder. (*People v. Marks* (2003) 31 Cal.4th 197, 230.)

### 1. Planning

With regard to planning, although Joyave points to his statements after the murder and trial testimony, which tend to show the killing occurred during an impulsive explosion of rage, there was other evidence from which a rational trier of fact could have concluded Joyave premeditated before killing L.M. The evidence showed Joyave and L.M. were engaged, but there were problems and trust issues in their relationship. About a month prior to the murder, Joyave choked L.M. into unconsciousness. In recounting the choking incident, he sent L.M. a text prior to the murder that commented on how her body was lifeless and stopped moving. He knew the hold could lead to death. On the days leading up to the murder, Joyave and L.M. fought via telephone and text message

11.

over money, dishonesty, and infidelity. When L.M. expressed her intent to leave Joyave hours before the murder, Joyave told her she was "seriously making a mistake[.]" He also told her several times she would "regret" her decision. Then, Joyave showed up unexpectedly at their apartment late at night before she returned from work. When L.M. returned home, the couple argued and Joyave came from behind, strangled L.M., and cut her throat multiple times while she was unarmed.[10]

These facts are sufficient to support a verdict of premeditated and deliberate first degree murder. Premeditation and deliberation can occur over a brief period. The absence of extensive planning evidence does not exclude a finding of premeditation. (*People v. Brady* (2010) 50 Cal.4th 547, 563; see also *Thomas, supra,* 25 Cal.2d at p. 900.) Here, Joyave deliberately took a knife, strangled L.M., and cut her several times. (See, *People v. Perez* (1992) 2 Cal.4th 1117, 1126 (*Perez*) [substantial evidence of planning activity found when the defendant surreptitiously entered the house and obtained a knife from the kitchen prior to stabbing the victim]; *People v. Miller* (1990) 50 Cal.3d 954, 993 (*Miller*) [the fact that the defendant took a weapon and "used it to kill an unarmed victim, reasonably suggests that he considered the possibility of murder in advance"].) Even according to his own trial testimony, Joyave admitted to arming himself with the knife. He had the opportunity to consider his own actions, while armed with a knife, but still decided to cut L.M.'s throat multiple times while she was defenseless. While the extent of Joyave's reflection may have been rapid, the evidence, viewed in the light most favorable to the prosecution, shows purposeful planning activity. (See, e.g. *People v. Hernandez* (1988) 47 Cal.3d 315, 350.)

*People v. Boatman* (2013) 221 Cal.App.4th 1253 (*Boatman*), relied on by Joyave, is distinguishable. In *Boatman*, the defendant picked his girlfriend up and drove her to

_____

[10] Blood was found splattered about nine feet from L.M.'s neck, however, Joyave did not have blood on him. This evidence supports a reasonable inference that Joyave cut L.M.'s throat while he was behind her.

his house, occupied by four other people who knew the defendant. The defendant took a gun away from his girlfriend, she slapped the gun from his hand, and the gun went off. (*Id*. at p. 1260.) The defendant testified that he did not intend to shoot her, but as soon as she slapped the gun, he tried to grab ahold of it, squeezed the trigger, and the gun fired. (*Id*. at p. 1260, 1267.) The defendant was "horrified and distraught" after the shooting, he tried to resuscitate his girlfriend and immediately directed his brother to " 'call the cops.' " (*Id*. at p. 1267.) The Fourth District found no evidence of planning or motive, and concluded the manner of killing—shooting the victim in the face—failed to show a " ' "preconceived design" to take the victim's life[.]' " (*Id*. at pp. 1267–1268.)

In contrast, here, there was ample evidence that Joyave premeditated L.M.'s murder. Aside from the evidence above, Joyave's threatening text messages support a reasonable inference of planning. (*People v. Evans* (1970) 8 Cal.App.3d 152, 157 [the defendant warned the victim, " 'I'm going to get you," ' and after shooting the victim he grabbed the victim's neck and said, " 'I told you I was going to get you' "]; *People v. Martinez* (1987) 193 Cal.App.3d 364, 371 [the defendant's threats prior to killing are evidence of planning].) The evidence of planning may also be inferred from the fact that Joyave deleted the threatening text messages he sent to L.M. prior to the murder. Moreover, the conclusion that Joyave strangled L.M. to unconsciousness on a prior occasion, and his recognition the hold could lead to death, indicates planning activity. (*Miller, supra,* 50 Cal.3d at p. 993 [the conclusion that the defendant committed a substantially similar crime on a separate occasion indicates planning activity].)

The jury also heard evidence regarding Joyave's activities after the murder. While we do not consider his post-crime activities in isolation, a jury could reasonably infer Joyave's conduct after the murder supported a reasonable inference that the killing was thoughtful, premeditated, and deliberate. (See *People v. Thompson* (2010) 49 Cal.4th 79, 113 ["*Anderson* … warns against using evidence of a defendant's post-crime actions and statements as the sole support for upholding a finding of premeditated and deliberate

13.

murder, [but] such post-crime actions and statements can support a finding that the defendant committed a murder for which his specific mental state is established by his actions before and during the crime"], *Perez, supra,* 2 Cal.4th at p. 1128 [post-crime actions probative of premeditation and deliberation]; *People v. Eggers* (1947) 30 Cal.2d 676, 686 ["the means of disposing of the body, the efforts made to prevent identification, and [the defendant's] conduct both prior to and immediately after the crime was committed" supported the jury's conclusion that the crime was premeditated and deliberate].)

The evidence suggests Joyave called an ambulance after L.M. was already dead. Joyave testified he walked out of the room after he cut L.M.'s throat. Joyave further said he went back into the room to make sure L.M. was not moving. Then, he called his friend and talked to him for four minutes prior to seeking medical attention for L.M. When Joyave finally called an ambulance, he told the dispatcher that L.M. was not breathing and "felt cold." Joyave failed to seek immediate medical attention for L.M., supporting an inference that he carried out a preconceived plan to kill. (*People v. Williams* (2018) 23 Cal.App.5th 396, 412.)

Joyave argues his testimony tends to show lack of premeditation. For example, Joyave said when he went back to their apartment he did not intend to hurt her but wanted to discuss their text messages. He claims L.M. introduced a kitchen knife into their argument and twice lunged at him with it. As the yelling and arguments continued, he contends he acted impulsively out of "rage" and "used the blade" on her. He also claimed he acted in self-defense. However, the jury rejected his explanation of how the killing occurred and also rejected the evidence which showed lack of premeditation, when weighed against other evidence to the contrary. The jury was entitled to disbelieve Joyave's self-serving statements and reject the portions it did not believe.[11] (See, *People*

---

[11] Joyave made several untruthful statements to law enforcement that were revealed to the jury at trial. When asked about the scratches he had on his body, he

14.

*v. Smith* (1940) 15 Cal.2d 640, 648 ["the jury was not required to accept such portions of the evidence as might have tended to show lack of premeditation, when weighed against other evidence adduced to the contrary"]; *People v. Silva* (2001) 25 Cal.4th 345, 369 ["A rational trier of fact could disbelieve those portions of defendant's statements that were obviously self-serving[.]"].)  Such actions reflect purposeful evasion which, when considered with the other evidence discussed above, a reasonable jury could determine reflected the overall premeditated and deliberate nature of the murder.  (C.f. *Boatman, supra*, 221 Cal.App.4th at pp. 1273–1274 [the act of pulling back the hammer on a loaded gun and pointing it at another, without more, does not provide substantial evidence of premeditated murder].)

### 2. *Motive*

The jury could have also construed the evidence as establishing a motive, such as Joyave deliberately intended to kill L.M. because of the conflict in their relationship, jealousy, and fear L.M. would leave him.  (See, *People v. Daniels* (1971) 16 Cal.App.3d 36, 46 ["evidence showing jealousy, quarrels, antagonism or enmity between an accused and the victim of a violent offense is proof of motive to commit the offense"]; *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1613 [evidence of marital discord and prior assaults shows "ill will and motive" and supports the inference that the defendant committed a premeditated murder against his partner].)

Joyave relies on *People v. Bender* (1945) 27 Cal.2d 164, 180 (*Bender*), abrogated on other grounds by *People v. Lasko* (2000) 23 Cal.4th 101, 110, and *People v. Hopper*

---

claimed he fell out of bed and hit a dog ramp on the ground.  He maintained L.M. suffered from self-inflicted wounds.  And, when confronted by law enforcement about what happened prior to L.M.'s death, Joyave claimed L.M. was thirsty and he left to get her a Gatorade, different from the flavors they already had in the apartment.  He said the gas station was closed, and when he returned, he found L.M. face first on the ground, bloody and wounded from suicide.  Joyave's lies were a central theme in the prosecution's case at trial, and he admitted his dishonesty.

(1956) 145 Cal.App.2d 180, 184–186, 188, 190 (*Hopper*), for the proposition that prior violent disagreements in a relationship fail to show the defendant had a motive for killing his partner absent something more. In those cases, both courts concluded that "there was substantially no evidence casting light on either motive or intent at the time of the killing[.]" (*Hopper*, at p. 189; *Bender*, at p. 179.)

In *Hopper*, the abuse occurred at widely separated intervals, and there was nothing to show the couple was fighting on the day of the killing. (*Hopper*, *supra*, 145 Cal.App.2d at p. 188.) The court stated, "occasional threats and acts of violence committed by [the defendant] against [the victim] which were widely separated and interspersed by amicable relations throws no light whatever upon whether or not [the defendant] is guilty of a willful, deliberate and premeditated murder." (*Id*. at p. 190.) The Third District held that the record failed to show the victim's "beating differed from others" and that the defendant carried out a preconceived design to kill. (*Ibid*.) Similarly, the defendant and the victim in *Bender* fought because the defendant failed to tell the victim that his previous marriage had not been dissolved, and after several hours of drunken quarreling the defendant killed the victim. (*Bender, supra*, 27 Cal.2d at p. 179.) However, the victim suffered multiple injuries to her body, including a head injury, and it could not be determined whether the cause of death was the result of a beating or something else. (*Id*. at p. 170.)

Our case is inapposite. The evidence before us shows L.M.'s murder was not perpetrated by a violent act on the spur of the moment during a tempestuous quarrel. We find *People v. De Moss* (1935) 4 Cal.2d 469 analogous. There, the defendant and his wife were estranged and had been living apart for about three weeks prior to the murder. (*Id*. at p. 471.) During the year prior to the murder, the defendant had been abusive to his wife and had mistreated his family. (*Ibid*.) On the day of the shooting, the defendant drove his car to the place where his wife was living. (*Ibid*.) She only had a conversation with him from the side of his car after he threatened her. (*Id*. at p. 472.) At the end of the

16.

conversation, the defendant went about sixty feet from his wife and shot her multiple times, causing her death. (*Id*. at pp. 471–472.) The Supreme Court held the quarrels and separations of the parties, together with the threats of the defendant, established a sufficient motive for the killing to support the defendant's first degree murder conviction. (*Id*. at p. 473.)

Here, L.M. and Joyave's relationship was littered with problems. Joyave had previously choked L.M. into unconsciousness, was physically abusive, and jealous of L.M.'s beauty. L.M. was afraid of him. Joyave and L.M. fought in the days leading up to the murder. When L.M. expressed her desire to end their relationship, Joyave threatened her, and showed up at their apartment late at night. Joyave was "depressed" and angry at the "belittling" things L.M. said to him during their argument. Joyave then armed himself with a knife, strangled L.M., and cut her throat multiple times. The jury could have reasonably inferred the evidence was sufficient to establish Joyave's motive for the killing. (See, e.g. *People v. Disa* (2016) 1 Cal.App.5th 654, 666 [the evidence suggested the defendant's motive for killing his girlfriend was jealousy over her relationship with a prior lover, rage because the victim was trying to kick the defendant out of his own house and was insulting him, and perhaps depression over the apparent ending of their relationship].)

### 3. *Manner*

The manner of killing does not establish a sudden explosion of violence but rather a calculated killing. L.M. suffered from "multiple deep cuts to … the front of her neck." The wound to L.M.'s throat was "complex" and showed "multiple points of impact with a sharp item[.]" A reasonable jury could infer from the evidence that Joyave wanted not only to wound L.M. but to make sure she died.[12] (See, *People v. Lewis* (2009) 46 Cal.4th

---

[12] We note during sentencing, the trial court said that this was "[o]ne of the worst injuries ever inflicted upon a victim that [the court has] ever seen."

1255, 1293 [the manner of killing supported a finding of premeditation and deliberation because the victim was strangled before her throat was cut, and "even if the initial strangulation was spontaneous, the additional act of slashing [the victim's] throat 'is indicative of a reasoned decision to kill' "]; *Perez, supra*, 2 Cal.4th at p. 1129 [sufficient evidence supported a finding of premeditation and deliberation when the defendant stabbed the victim and his knife broke, he went searching for another knife to ensure the victim died]; *People v. Elliot* (2005) 37 Cal.4th 453, 471 [the repeated slashing of the victim's throat, in combination with dozens of other wounds, supports a reasonable inference of a calculated design to kill].)

Joyave argues that it is "possible" L.M.'s stab wound was caused by only a single cut to the neck. He contends the wound was not so particular and exacting to show that he had a preconceived design to kill. But Joyave simply argues competing inferences on appeal he wishes the jury had drawn. Joyave also ignores evidence of L.M.'s other injuries, such as the evidence showing she was strangled and suffered abrasions caused by blunt force trauma prior to death. As in *People v. Alcala* (1984) 36 Cal.3d 604, 627,[13] this brutal method of killing, considered in light of the planning and motive evidence, supports the inference of a calculated design to ensure L.M.'s death rather than an "unconsidered 'explosion' of violence." (See, also *People v. Hovey* (1988) 44 Cal.3d 543, 556 [the defendant stabbed or beat the victim repeatedly in the head supporting an inference of premediated murder]; c.f. *Bender, supra*, 27 Cal.2d at p. 170 [the immediate cause of death was a head injury to an intoxicated victim, but it could not be determined whether the victim's head wounds were due to something hitting the victim's head or from the head hitting an object].)

---

[13] *Alcala* was abrogated by statute on another ground, as explained in *People v. Falsetta* (1999) 21 Cal.4th 903, 911.

18.

After our review of the record in the light most favorable to the prosecution, we conclude it contains ample evidence to sustain the verdict of first degree murder on a theory of premeditation and deliberation.

## II.     Review of Subpoenaed High School Records

Joyave argues he was denied the right to a fair trial and an effective defense because the trial court did not allow defense counsel to review L.M.'s sealed records from Kern High School.[14]  Joyave requests we conduct an in camera review of L.M.'s records to confirm there was no discoverable material.  If any discoverable information is identified, Joyave requests a conditional reversal for the purpose of determining whether on remand he can establish prejudice.  The People concede Joyave's request for review by this court is appropriate, but do not weigh in on whether an in camera review should be conducted.  We will review L.M.'s sealed records from Kern High School to determine whether the court erred in failing to disclose the records to defense counsel.[15]

### A. Additional Background

Prior to trial, defense counsel subpoenaed L.M.'s Kern High School records and requested the court to conduct an in camera review of the records.  Specifically, defense counsel asked the court to review the records to determine whether there was any information regarding L.M.'s dishonesty, violence, and trouble she had in school that defense counsel could use for impeachment purposes at trial.

On November 8, 2022, pursuant to defense counsel's request, the trial court considered the records and found no discoverable evidence.  No records were released to defense counsel for use at trial.

---

[14] Joyave asserts in his opening brief that L.M.'s records from Kern High School were sealed.  Pursuant to the affidavit filed by the clerk of the Kern County Superior Court, the records were not sealed.

[15] For the reasons set forth below, we decline to review the records in camera.

19.

On April 17, 2025, on our own motion, we ordered that the appellate record be augmented to include all material considered by the trial court regarding L.M.'s records from Kern High School.

## B. Analysis

Joyave asks us to examine L.M.'s records from Kern High School, which his counsel subpoenaed, and the trial court reviewed, to determine whether the court should have disclosed the records. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1228 (*Mooc*) [specifying procedures set for obtaining access to police personnel records set forth in *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*)]; see also *Kling v. Superior Court* (2010) 50 Cal.4th 1068, 1074–1075 [in criminal cases the trial court is charged with determining whether there is good cause to disclose confidential records].) The parties do not dispute the trial court reviewed L.M.'s school records; however, they request we review the records to ensure Joyave received a fair trial. (See *Pitchess, supra*, 11 Cal.3d at p. 536 [the trial court is obligated to release records containing information that would facilitate the ascertainment of the facts and a fair trial in a criminal proceeding].)

We first turn to the appropriate standard of review. Joyave contends we should conduct a de novo review of the records to determine whether discoverable material existed. However, none of the cases Joyave cites suggests that a de novo standard of review should be used in this case. (See. e.g. *People v. Breaux* (1991) 1 Cal.4th 281, 311 [a trial court's decision on the discoverability of material in police personnel files is reviewable under an abuse of discretion standard]; *Pitchess, supra*, 11 Cal.3d at p. 535 ["a defendant's motion to discover is addressed solely to the sound discretion of the trial court, which has inherent power to order discovery when the interests of justice so demand"]; see also *Mooc, supra,* 26 Cal.4th at pp. 1228–1229 [when a trial court states for the record what documents it examined, the reviewing court may review those documents, or augment the record to include those documents, to determine whether the

20.

trial court abused its discretion in failing to disclose the documents].)  We apply the foregoing authorities to the instant case.  A trial court's decision regarding the discoverability of records is reviewable under an abuse of discretion standard.

We then turn to whether Joyave is entitled to an in camera review of L.M.'s high school records.  We find no authority mandating a reviewing court to conduct an *in camera* review of the records.  For example, in *Mooc, supra,* 26 Cal.4th at p. 1232, while our high court reviewed the complete personnel file of the police officer and found no disclosable evidence, there was nothing indicating the review was done in camera.  Similarly, in *People v. Webb* (1993) 6 Cal.4th 494, 518, the reviewing court did not conduct an in camera review of a prosecution witness's psychiatric records.  There, our Supreme Court held that it reviewed the psychiatric records at issue and found the lower court did not err in failing to disclose the records.  (*Ibid*.; accord *People v. Jackson* (1996) 13 Cal.4th 1164, 1221, fn. 10 [explaining that our Supreme Court "reviewed the sealed record of the in camera proceeding" and found the trial court did not abuse its discretion in denying defendant's discovery request].)  Therefore, we decline to conduct an *in camera* review.

We have reviewed L.M.'s records from Kern High School considered by the trial court.  The records revealed L.M.'s student profile, including class schedules, grades, attendance records, health and immunization records, and standardized test reports.  The records also contained three dress code violations on September 12 and October 17, 2013, and November 21, 2014.  A student conference report dated August 17, 2016, showed L.M. reported other students bullying and harassing her.  L.M.'s class schedule was changed, and her parents were notified.

The court did not abuse its discretion.  There was no information contained in the records from Kern High School pertaining to L.M. that would assist in the defense of the case.

# **DISPOSITION**

The judgment is affirmed.

FAIN, J.*

WE CONCUR:


LEVY, Acting P. J.


DETJEN, J.

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.